David MCNALLY, Plaintiff,

v.

PRISON HEALTH SERVICES,
Defendant.

No. Civ. 98–290–P–C.

United States District Court,
D. Maine.

April 27, 1999.

Stuart W. Tisdale, Jr., Mary A. Davis, Tisdale & Davis, Portland, Maine, for plaintiff.

James E. Fortin, Douglas, Denham, Rogers & Hood, Portland, Maine, for defendant.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

Plaintiff David McNally filed a two-count Complaint against Defendant Prison Health Services ("PHS") on August 12, 1998 (Docket No. 1). In Count I of the Complaint, Plaintiff claims that the alleged deliberate indifference exhibited by PHS to his serious medical needs constituted a deprivation of his constitutional rights, cognizable under 42 U.S.C. § 1983. In Count II, Plaintiff alleges that PHS discriminated against him on the basis that he has the Human Immuno-deficiency Virus ("HIV"), in violation of the Americans with Disabilities Act, 42 U.S.C.A. § 12101 et seq. ("the ADA"). Plaintiff also seeks attorney fees pursuant to 42 U.S.C. § 1988.

On December 8, 1998, the Court denied PHS's motion to dismiss the Complaint. See McNally v. Prison Health Services, 28

F.Supp.2d 671 (D.Me.1998). Presently before the Court is PHS's Motion for Summary Judgment (Docket Nos. 9, 11) and Plaintiff's opposition thereto (Docket No. 14). For the reasons below, PHS's motion will be denied.

## BACKGROUND

On November 3, 1997, at approximately 6:00 p.m., Plaintiff was arrested at his home. Plaintiff's Statement of Material Fact ¶ 2; Defendant's Statement of Material Facts at 1. At the time of his arrest, Plaintiff had been diagnosed as positive for HIV, McNally Deposition at 14, and was on a regimen of HIV medication prescribed by his doctor, Owen Pickus, D.O. Plaintiff's Statement of Material Fact ¶ 1. Plaintiff was prescribed AZT and 3TC, which he took two times a day, and Crixivan, which he took three times a day. *Id.* His daily protocol was to take AZT, 3TC, and Crixivan at 8:00 a.m., Crixivan at 4:00 p.m. and midnight, and the AZT and 3TC at 8:00 p.m. *Id.* At the time Plaintiff was arrested, he had missed his 4:00 p.m. dose of Crixivan. *Id.* at ¶ 2.

Plaintiff was in jail from November 3 until November 6, 1997. *Id.* ¶¶ 2, 28; Defendant's Statement of Material Facts at 1, 3. On November 4, 1997, after returning from his bail hearing, Plaintiff was moved to the prison infirmary after complaining of chills, sweats, and flu-like symptoms including vomiting. Plaintiff's Statement of Material Fact ¶ 12. Plaintiff attests that he repeatedly informed jail personnel, including the officers who arrested him and the nurses on duty at PHS, that he was on a protocol of HIV medication, that he had missed several doses, and that he must receive his medication. Plaintiff's Statement of Material Fact ¶¶ 3, 6, 7, 10, 12, 13, 14. PHS disputes that Plaintiff told PHS on the night of his admission to the jail that he was prescribed HIV medication, but concedes that by late morning on November 4, it was aware that Plaintiff was prescribed medication for HIV infection and that he had not taken his medication since November 3. Defendant's Statement of Material Facts at 2. Furthermore, Phebe Dixon, R.N., the PHS Director, testifies in her deposition that Plaintiff's HIV status and medication protocol was on file with PHS because of a prior arrest and treatment. Dixon Deposition at 29. Plaintiff was in the prison infirmary for the entire time that he was in police custody and did not receive any medication for HIV. Plaintiff's Statement of Material Fact ¶¶ 12, 13, 14.

PHS explains that the jail maintains a "formulary" of commonly prescribed drugs and medications. Defendant's Statement of Material Facts at 2. When a detainee enters the jail and provides a history of taking a prescription medication, a PHS physician will prescribe the medication or a reasonable substitute from its formulary. *Id.* If no reasonable substitute exists in the formulary, the medication will be prescribed with the approval of the facility medical director. *Id.* at 2. PHS asserts that all medications used for the treatment of HIV infection are listed in PHS's formulary and were available and obtainable, in 1997, within twenty-four hours of a determination that they were needed. *Id.* It was also permissible in 1997 for an inmate to have another person retrieve his medications from his home. Maluk Deposition at 11. PHS has asserted that in regard to treatment for detainees with HIV who arrive at jail having missed dosages of medication, PHS contacts the AIDS Consultation Service at Maine Medical Center to obtain advice on whether an inmate's medications should be restarted or whether a "viral load" test should be performed first. Defendant's Statement of Material Facts at 3.

PHS asserts that it did not restart Plaintiff's HIV medication because Nurse Maluk, L.P.N., the nurse on duty in November 1997, and Nurse Dixon understood that it could be dangerous to restart HIV medications once a dose had been missed because HIV patients who have missed dosages of their medication may no longer

respond to the drugs. Defendant's Statement of Material Facts at 3; Maluk Deposition at 19; Dixon Deposition at 8–9, 18–20. From the record, it is not clear exactly where Nurse Maluk and Nurse Dixon gained this understanding as both discuss their training regarding HIV in general terms. Maluk Deposition at 28; Dixon Deposition at 9–12. PHS originally asserted that Nurse Maluk called the AIDS Consultation Service about whether or not Plaintiff should receive his medication and was advised to obtain more information about Plaintiff's "viral load" before restarting his medication. Defendant's Statement of Material Facts at 3. The original assertion was corroborated by Nurse Maluk's phone records. Maluk Deposition, Exhibit 1.[1] Sandra Putnam, Nurse Coordinator of the Aids Consultation Service, does not recall speaking with anyone at PHS nor do her records indicate that she received a call regarding Plaintiff's condition. Plaintiff's Statement of Material Fact ¶ 22; Putnam Deposition at 6–7, 16, 18–19. She further attests that it is not her practice to give advice to withhold any kind of medication for a patient that she had not seen herself nor would she train PHS to do so. Plaintiff's Statement of Material Fact ¶¶ 23, 24; Putnam Deposition at 8–10, 15–16, 17.

The record indicates that Nurse Maluk from PHS called Dr. Pickus on November 5, who told PHS that Plaintiff needed his medication. Plaintiff's Statement of Material Fact ¶ 21; Defendant's Statement of Material Facts at 3; Pickus Deposition at 33–35. Dr. Pickus testified that he did not advise PHS to obtain information regarding Plaintiff's "viral load" prior to resuming his treatment, and he testified that such advice would be "ridiculous." Pickus Deposition at 97–98.

On November 6, two days after PHS admits it was aware of Plaintiff's HIV status and prescription, blood was drawn from Plaintiff and sent to a laboratory for analysis in order to obtain information about Plaintiff's "viral load." Defendant's Statement of Material Facts at 3. On the same day, Plaintiff was released from jail without having received his HIV medication. Upon his release from jail, Plaintiff contacted Dr. Pickus who advised him to resume taking his medication according to his usual schedule. Plaintiff's Statement of Material Fact ¶ 16; Defendant's Statement of Material Facts at 3. As discussed below, the parties dispute whether or not Plaintiff was harmed by the interruption in his medication protocol.

## DISCUSSION

Summary judgment is appropriate when the record shows there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial burden to show there is a lack of evidence to support the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party has come forward identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" which "it believes demonstrate the absence of a genuine issue of material fact," the adverse party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *See id.* at 322, 106 S.Ct. at 2551–52.

The trial court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that

---

1. After Plaintiff's objection to summary judgment was filed and the deposition of Sandra Putnam, the nurse coordinator at the AIDS Consultation Service, was taken, PHS withdrew its assertion that it contacted the AIDS Consultation Service in regard to Plaintiff's case. Defendant's Letter Motion to Withdraw Assertion (Docket No. 18). Defendant's Letter Motion to Withdraw Assertion (Docket No. 18). The Court grants PHS's unopposed letter motion.

party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). The Court, however, will not, pay heed to "conclusory allegations, improbable inferences [or] unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). If no genuine issue of material fact emerges, then the motion for summary judgment may be granted.

### I. The Section 1983 Claim.

Section 1983 creates a cause of action against those who, acting under the color of state law, violate federal law.[2] The premise of Plaintiff's cause of action under section 1983 is that PHS deliberately denied him his HIV medication, in violation of his right to due process guaranteed under the Fourteenth Amendment of the United States Constitution.[3] The Due Process Clause of the Fourteenth Amendment requires responsible governmental authorities to provide medical care to persons apprehended by the police. *See City of Revere v. Massachusetts General Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). The United States Court of Appeals for the First Circuit analyzes pre-trial detainees' section 1983 claims for Fourteenth Amendment violations under the "deliberate indifference" standard. *See Consolo v. George,* 58 F.3d 791, 794 (1st Cir.1995); *Elliott v. Cheshire County, NH,* 940 F.2d 7, 10 (1st Cir.1991).

 "[Fourteenth Amendment] claims by pretrial detainees alleging denials of medical assistance essentially turn on whether the challenged official action constituted 'deliberate indifference' to a

serious 'medical need'." *Mahan v. Plymouth County House of Corrections,* 64 F.3d 14, 17 (1st Cir.1995) (citing *Consolo,* 58 F.3d at 793–94); *Bowen v. City of Manchester,* 966 F.2d 13, 17 n. 13 (1st Cir. 1992). The first query for the Court is whether Plaintiff suffered from a "serious" medical need. A medical need is "serious" if it has been diagnosed by a physician as mandating treatment, or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *See Mahan,* 64 F.3d at 18 (citing *Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203, 208 (1st Cir.1990), *cert. denied,* 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991)). The "seriousness" of a detainee's medical needs may be determined by reference to the effect of the delay of treatment. *See Gaudreault,* 923 F.2d at 208.

At the time he was arrested and taken to Cumberland County Jail in November of 1997, Plaintiff had been diagnosed by a physician as positive for HIV and was on a regimen of HIV medication prescribed by Dr. Pickus Plaintiff's Statement of Material Fact ¶ 1; McNally Deposition at 14. His medication included AZT and 3TC, which he took two times a day, and Crixivan, which he took three times a day. Plaintiff's Statement of Material Fact ¶ 1. At the time Plaintiff was arrested, he had missed his 4:00 p.m. dose of Crixivan. *Id.* ¶ 2.

 The fact that Plaintiff was diagnosed as positive for HIV by a physician does not, on its own, necessarily establish that Plaintiff suffered from a "serious" medical need for purposes of his constitu-

---

2. Title 42 U.S.C. § 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

3. In *McNally,* 28 F.Supp.2d at 673, the Court agreed with the parties' mutual position that because Plaintiff is a pre-trial detainee, his claim is properly analyzed under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment of the United States Constitution. *See City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983).

tional claim. As mentioned, Plaintiff's condition may be surveyed from the perspective of reference to the *effect* of not receiving his medication. *See Gaudreault*, 923 F.2d at 208. Plaintiff has submitted the deposition of his treating physician, Dr. Pickus, who testified that when a patient misses doses of medication, the HIV virus can "grow[ ] very quickly and also become[ ] resistant to drugs very quickly, and within a month [one] can have a . . . virus go from completely susceptible to completely resistant [to medication]." *See* Pickus Deposition at 59. The record also indicates that when PHS contacted Dr. Pickus to confirm Plaintiff's diagnosis and prescription, Dr. Pickus advised PHS that Plaintiff had tested positive for HIV, and that he needed his medication. Plaintiff's Statement of Material Fact ¶ 21; Defendant's Statement of Material Facts at 3. Furthermore, the record demonstrates that Plaintiff was placed in the infirmary and remained there for his entire incarceration with fever, chills, and flu-like symptoms that included vomiting. Plaintiff's Statement of Material Fact ¶¶ 9, 12, 13, 14. According to Plaintiff, his HIV status is a "serious" medical need because the denial of his medication caused him to suffer unpleasant physical symptoms and, of more importance, placed him at risk of developing an HIV strain resistant to HIV medication, a result which could render his life-threatening infection intractable.

PHS has chosen not to submit the opinion of its own expert to challenge Dr. Pickus's version of the effects of missed HIV medication and, instead, has chosen to seize on the vacillations and equivocations contained in Dr. Pickus's deposition testimony. PHS insists that Dr. Pickus's testimony conclusively establishes that the effects of missed HIV medication are minimal and that Plaintiff, in particular, suffered no harm from being denied his HIV medication for three days in November of 1997. *See* Defendant's Motion for Summary Judgment at 6–7; Defendant's Supplement to Motion for Summary Judgment at 2–4. It is true that Dr. Pickus could not

say with certainty that the physical symptoms suffered by Plaintiff while he was in jail were related to his having not received his HIV medication. Pickus Deposition at 109, 112, 119–120. The possible other factors that caused Plaintiff's discomfort include his having consumed alcohol the night before his incarceration and the cellulitis in his elbow. *Id.* at 109, 112, 119–20. In addition, Dr. Pickus states that, in his opinion, Plaintiff did *not* develop a resistant strain of HIV virus simply because of the "hiatus in his medicine while he was in jail." *Id.* at 90–92, 106.

Notwithstanding this testimony, Dr. Pickus does proffer that the flu-like symptoms that Plaintiff suffered in jail "might have been" related to the fact that he did not receive his HIV medication. Pickus Deposition at 112, 119–120. Although Dr. Pickus testified that Plaintiff did not develop a resistant strain of the virus, Dr. Pickus testified that some mutational changes may have resulted that, in cumulation with additional mutational changes caused by missed medication, could lead to drug resistance in Plaintiff's future. *Id.* at 114–16. Lab tests indicate that Plaintiff's CD4 cell count did drop from 584 in September 1997 to 350 in December, shortly after having his medication denied at the jail. *Id.* at 85–87.

In sum, Plaintiff was diagnosed with HIV by a physician and was placed on a protocol of HIV medication. Viewing Plaintiff's medical status from the perspective of the effect of Plaintiff having been denied treatment, a jury could infer from Dr. Pickus's testimony that Plaintiff's HIV status was exacerbated by PHS's denial of his medical treatment. A jury could, of course, also conclude that Plaintiff was not harmed by the interruption in his HIV medical treatment. PHS's arguments, which address whether Plaintiff himself suffered any harm, are more appropriately directed to the issue of damages and not to whether Plaintiff's medical need was "serious" enough so that PHS's alleged deliber-

ate indifference to its treatment is cognizable under section 1983. Accordingly, the Court finds that a genuine dispute exists as to whether Plaintiff suffered from a "serious" medical need.

■ Having determined that a genuine dispute exists as to whether Plaintiff suffered from a "serious" medical need, the Court must now determine whether the record fails to establish a trial worthy claim that PHS was "deliberately indifferent" to Plaintiff's HIV status. If, on the record submitted for purposes of this motion, the Court finds or can infer that PHS acted with deliberate indifference to Plaintiff's HIV status and need for his medication, the Court will deny summary judgment. The Court of Appeals for the First Circuit has stated that "jail officials violate the due process rights of their detainees if they exhibit a deliberate indifference to the medical needs of the detainees that is tantamount to an intent to punish." *Elliott*, 940 F.2d at 10 (citing cases). Thus, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Indifference on the part of prison health personnel can be evidenced by their response to the detainee's needs. *See Estelle*, 429 U.S. at 104, 97 S.Ct. at 291. In order for prison officials to be found deliberately indifferent to the medical needs of detainees, prison officials must be shown to have been subjectively aware of a condition requiring their intervention. *See Mahan*, 64 F.3d at 18 (citing *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). " 'A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment ...' " *Rodriguez v. Joyce*, 693 F.Supp. 1250, 1253 (D.Me.1988) (citing *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292). Accordingly, "[w]here a plaintiff has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Bouchard v. Magnusson*, 715 F.Supp. 1146, 1149 (D.Maine 1989) (citing *Layne v. Vinzant*, 657 F.2d 468, 474 (1st Cir.1981)).

■ It is undisputed that Defendant was subjectively aware of Plaintiff's serious medical condition. Plaintiff has asserted that he repeatedly requested his medication from the arresting officers and from the nurses at PHS. Plaintiff's Statement of Material Fact ¶¶ 3, 6, 7, 10, 12, 13, 14. PHS admits that it was aware of Plaintiff's HIV status and his prescription by November 4, 1997. Defendant's Statement of Facts at 2. Moreover, the record demonstrates that Plaintiff had been a patient of PHS before and that PHS had records of his HIV status. Dixon Deposition at 29. The record also demonstrates that Dr. Pickus advised Nurse Maluk, when she called, to administer Plaintiff's HIV medication. Plaintiff's Statement of Material Fact ¶ 21; Defendant's Statement of Material Facts at 3. Furthermore, Plaintiff was experiencing chills, fever, night sweats, and flu-like symptoms when he was admitted to the infirmary. Plaintiff's Statement of Material Fact ¶ 12; Defendant's Statement of Material Facts at 3. Accordingly, the Court finds that, according to the record submitted upon this motion, PHS was subjectively aware of Plaintiff's serious medical condition.

PHS urges the Court to characterize this case as one where the prison officials and the detainee merely disagreed over the proper course of medical treatment. According to PHS, the disagreement over Plaintiff's appropriate treatment resulted in a delay, rather than a complete denial of medical care. PHS explains that it did not refuse to give Plaintiff his HIV medication but chose to obtain information about Plaintiff's "viral load" before restarting his medication because Nurse Maluk and Nurse Dixon understood that it could be dangerous to restart Plaintiff's HIV medi-

cation once a dose had been missed. Defendant's Statement of Material Facts at 3.[4] Indeed, Dixon testifies in her deposition that, prior to providing their HIV medication, PHS conducts a "viral load" test on HIV-positive detainees who indicate that they have missed doses of their medication. Dixon Deposition at 17–19. PHS further explains that it was in the process of obtaining Plaintiff's "viral load" to determine whether administering Plaintiff's medication was appropriate when Plaintiff was released from jail on bail. Defendant's Statement of Facts at 3. Thus, PHS asks the Court to conclude that this is a case where PHS and Dr. Pickus simply disagree over how to treat an HIV-positive patient who has missed doses of medication and that even if PHS's ultimate decision was wrong, it does not rise to a constitutional violation.

It is true that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292. Thus, a negligent medical decision, even if wrong and with harmful consequences, does not represent a violation of a detainee's constitutional rights. At first blush, PHS's explanation that it followed a policy that required it to test Plaintiff's "viral load" to determine whether it was dangerous to resume his medication sounds like a medical decision that, although it may have resulted in malpractice, does not constitute a constitutional violation. However, the Court is not convinced that, on this record, there is no evidence from which a jury could infer that PHS was deliberately indifferent to Plaintiff's medical needs.

In this case, Plaintiff's treating physician advised PHS to resume Plaintiff's medication. Plaintiff's Statement of Material Fact ¶ 21; Defendant's Statement of Material Facts at 3. Furthermore, Plaintiff was suffering from fever, chills, and flu-like symptoms when he was admitted to the prison infirmary and remained in the infirmary for the entire period of his incarceration. Plaintiff's Statement of Material Fact ¶ 12. PHS refused to provide Plaintiff with his HIV medication or permit a person from the jail to pick up his medications from his home, despite his repeated requests, his exhibition of physical discomfort, and his treating physician's advice to resume his medication.

Moreover, the evidence proffered by Plaintiff casts doubt over PHS's explanation that it was simply following a recommended protocol of testing Plaintiff's "viral load" prior to administering medication. In her deposition, Nurse Dixon testified that because of the information and training provided her by the AIDS Consultation Service, she tests an HIV-positive patient's "viral load" when the patient has missed dosages. Dixon Deposition at 8–9, 18–20. Nurse Maluk testified to the same. Maluk Deposition at 19. However, Nurse Putnam of the Aids Consultation Service states in her deposition that she would never advise delaying the administration of HIV medication and testing a patient's "viral load" unless she had examined the patient herself and that she has never trained others to follow this course. Plaintiff's Statement of Material Fact ¶¶ 23, 24; Putnam Deposition at 8–10, 15, 16, 17. In addition, Dr. Pickus testified that examining a patient's "viral load" prior to resuming HIV medication, even in a case where doses have been missed, is never advised prior to resuming HIV medication. Pickus Deposition at 62–63, 95–98. Dr. Pickus

---

4. It is not known whether PHS requires a "viral load" test and delays providing medication for all HIV-positive detainees who missed doses of medication according to a formal policy or whether this decision was made only in this case. In her deposition, Dixon suggests that she acted according to this protocol in regard to all HIV-positive patients who reported having had missed doses. Dixon Deposition at 16–19. Dixon also testifies to the existence of a written policy directing this course of treatment. *Id.* Nurse Maluk testified that a policy manual was provided to PHS staff. Maluk Deposition at 19. A PHS policy regarding HIV-positive patients was not submitted to the Court, nor has PHS stated in its statement of facts that such a policy was in place.

further testified to the serious dangers of interrupting and delaying the administration of HIV medication. Nurse Putnam also testified that she does not recall being called by PHS about Plaintiff in November of 1997. Putnam Deposition at 8. Furthermore, PHS does not explain why it delayed drawing blood for Plaintiff's "viral load" test until November 6, two days after it admits it was aware that Plaintiff needed his HIV medication. This delay caused Plaintiff to miss even more doses which, according to the evidence in the record, possibly exposed him to a greater risk of harm.

The question of why PHS denied Plaintiff his HIV medication is material to the issue of whether PHS was deliberately indifferent to Plaintiff's medical needs. On this record, a genuine dispute exists as to this issue. Indeed, a jury may find that PHS's decision not to provide Plaintiff with his HIV medication was a negligently made medical decision properly challenged in a state court medical malpractice action. However, the Court concludes that, on this record, a jury may also decide that it does not believe Nurse Dixon and Nurse Maluk's explanation for why they refused to administer Plaintiff's HIV medication upon his request. On this record, the Court cannot find, as a matter of law, that PHS tested Plaintiff's "viral load" on the advice of Nurse Putnam or because it honestly believed that such a course was required despite the evidence in the record that such a course is never advised. Resolving this issue requires evaluation of the credibility of the witnesses, which can be accomplished only at trial. A jury could find that PHS did not inadvertently fail to provide adequate medical care, merely deny Plaintiff the treatment of his choice, or innocently follow a faulty medical protocol. Rather, a jury may conclude that PHS's local reaction to Plaintiff's medical needs manifested deliberate indifference or that Plaintiff's case is an extreme example of PHS's substandard treatment of HIV-positive detainees. The Court concludes that, on the current record, a genuine dispute exists as to whether PHS was deliberately indifferent to Plaintiff's need for his HIV medication. Accordingly, the Court will deny PHS's motion for summary judgment on Plaintiff's civil rights claim.

## II. The ADA Claim.

PHS also moves for summary judgment on Count II on the grounds that the evidence fails, as a matter of law, to generate a jury question as to whether PHS denied Plaintiff access to its prescription program and "safe conditions of confinement" because he is HIV positive, thereby violating the ADA.[5] Title II of the ADA states that no "qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A plaintiff under Title II of the ADA must therefore show that he or she is a qualified individual with a disability who was denied participation in, or the benefits of, the services, programs, or activities of a public entity because of his or her disability. The defendant may raise the affirmative defense that the requested accommodation of the plaintiff's disability would constitute an undue burden, requiring "a fundamental alteration in the nature of a service, program, or activity or [resulting] in undue financial or administrative burdens." *See* 28 C.F.R. § 35.150(a)(3).

 It is now clear that prisons and jails are "public entities" covered by Title

5. In his Complaint, Plaintiff claims that PHS violated the ADA by "effectively denying him the ability to participate in or receive any of the benefits available to other inmates ... by making him sick and ill for the entire period of his incarceration." Complaint ¶ 22. The Court understands Plaintiff's ADA claim to allege that Plaintiff was denied access to PHS's prescription service as explained in Plaintiff's brief. Plaintiff's Objection to Motion for Summary Judgment at 14.

II of the ADA. *See Pennsylvania Dept. of Corrections v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998). In addition, Plaintiff is a "qualified individual with a disability" as the Supreme Court has ruled that HIV infection, even in its asymptomatic form, is a disability under the ADA. *See Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). The Department of Justice has further provided that "benefit" under the ADA includes "provision of services, financial aid, or disposition (i.e., handling, decision, sentencing, confinement, or other prescription of conduct)." 28 C.F.R. § 42.540. The commentary makes clear that "[t]he general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities." 28 C.F.R. § 35, App. A, Subpart B. Thus, PHS's prescription service and the disposition of HIV-positive prisoners' requests for their medication is a program or service of Cumberland County Jail. *Accord Gorman v. Bartch,* 152 F.3d 907, 912 (8th Cir.1998) (finding that "transportation service to the police station" was a service of the police within the meaning of the ADA.)

■ Defendant contends, however, that Plaintiff's claim fails as a matter of law because he has submitted no evidence that he was denied services offered to all inmates by the Cumberland County Jail because of his HIV status and contends only that he received poor medical treatment. To support its argument, PHS cites *Moore v. Prison Health Services,* 24 F.Supp.2d 1164, 1167 (D.Kan.1998), where the United States District Court for the District of Kansas granted a defendant's motion for summary judgment on a prisoner's Title II claim because there was no "evidence to support the contention that due to his disability, plaintiff has been unable to participate in programs or otherwise enjoy benefits offered to others incarcerated . . . ." In that case, the prisoner, whose leg was amputated, alleged that he

had been provided inadequate wheelchairs by the prison. *See id.* at 1165–66. That court reasoned that the prisoner's claim was no more than a complaint that his medical care was inadequate because he was provided poor quality wheelchairs. *See id.* at 1168. The court preserved a distinction between claims that the medical treatment received for a disability was inadequate from claims that a prisoner has been denied access to services or programs because he is disabled. *See also Bryant v. Madigan,* 84 F.3d 246, (7th Cir. 1996) (holding that the ADA does not create a remedy for medical malpractice).

*Moore* can be distinguished from the case at bar. Here, Plaintiff has contended that Cumberland County Jail discriminated against Plaintiff because of his HIV-positive status, not by providing him with inadequate care, but by denying him immediate access to prescribed medications, a service provided to detainees in need of prescriptions for other illnesses. The record shows that at Cumberland County Jail, when inmates enter the jail and claim that they are taking medication, PHS generally calls the 24–hour–on–call physician to check on the prisoner's assertion and, having corroborated the prisoner's claim, subsequently provides the medication. *Id.* at 15. In regard to HIV patients who have missed a dose of medication, however, Plaintiff has alleged, and evidence in the record corroborates the allegation, that PHS follows a different policy. *Id.* at 17–19. In these cases, according to Plaintiff, PHS orders a blood test and waits for the results before resuming medication. *Id.* at 19. The record lacks any medical explanation for this policy. Indeed, there is evidence in the record that such a delay causes harm to HIV-positive patients who may develop a viral strain resistant to medication. According to the record before the Court submitted for purposes of this motion, PHS has one policy for detainees taking HIV medication and one for detainees on medication for maladies other

than HIV.[6] Plaintiff's claim, thus, goes beyond that of the plaintiff in *Moore*, to challenge the denial of HIV-positive prisoners' access to PHS's prescription services. A jury could infer that PHS's policy effectively denies HIV-positive prisoners access to PHS's prescription program and adequate health services because of their particular disability.[7] PHS has not met its burden to show a complete lack of evidence to support Plaintiff's ADA claim, and resolution of this claim is not possible on the record before the Court. Thus, the Court will not grant summary judgment in Defendant's favor on Count II.

Accordingly, the Court **ORDERS** that PHS's letter motion to withdraw a factual assertion be, and hereby is, **GRANTED**. The Court **FURTHER ORDERS** that Defendant's motion for summary judgment (Docket Nos. 9 and 12) be, and it hereby is, **DENIED**.

6. In its Statement of Material Facts on page two, PHS avers that all medications used for the treatment of HIV infection are listed in PHS's formulary and were so listed in 1997. The facility should be able to obtain the medicines within twenty-four hours of determining that they are needed. Thus, HIV is not treated differently from other conditions an inmate may have. Rather, it is treated more favorably than some other conditions, treatments for which may not be included in the PHS formulary. Despite PHS's contention, PHS does not directly dispute Plaintiff's contention, supported by Dixon's deposition, that PHS normally delays resuming an HIV-positive detainee's medication.

7. It is not necessary for the Court to address the exact parameters of the ADA in the jail context. However, the Court notes that the United States Court of Appeals for the Ninth Circuit's decision in *Gates v. Rowland*, 39 F.3d 1439, 1446–47 (9th Cir.1994), is instructive insofar as it addresses the breadth of the ADA's application in the prison context. In that case, the court reasoned that Congress intended that the ADA provide protection for the rights of prisoners no broader than that which the Constitution provides. Thus, according to cases, a court should review the ADA's statutory rights in a prison setting in the same manner that it reviews constitutional rights in the prison setting and determine whether a prison regulation is valid because it is reasonably related to legitimate penological interests.