v.

STATE of Alaska, Department of Health and Social Services, Appellee.

No. S–9642.

Supreme Court of Alaska.

May 25, 2001.

Frank J. Bettine, Anchorage, for Appellant.

Kari C. Kristiansen, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, and Anita Alves, Assistant Public Advocate, and Brant McGee, Public Advocate, Anchorage, for Appellee.

Before FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

### OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Finding that C.W. had abandoned his young child, J.S., the superior court terminated C.W.'s parental rights. C.W. argues that termination violated the Children in Need of Aid (CINA) statute and the Americans with Disabilities Act (ADA). He claims that the State of Alaska violated the CINA statute by failing to make reasonable efforts to reunite him with his son, and violated the ADA by failing to provide alcohol treatment services that reasonably accommodated his allegedly substantial learning disability. We reject these arguments because, even assuming the state had a duty to make reasonable efforts to reunite C.W. with J.S. after he abandoned J.S., the superior court did not clearly err in finding that the state fulfilled this duty with its reasonable but fruitless attempts to contact C.W. after he had abandoned his son for three years and lost contact with all those involved in his son's CINA proceeding. Furthermore, we conclude that this abandonment finding justified termination notwithstanding any of C.W.'s arguments regarding the ADA because his alleged learning disability has no bearing on the abandonment issue and he has not argued that the state's efforts in contacting him were unreasonable under the ADA. We also conclude that the superior court did not clearly err by failing to incorporate visitation into its order terminating C.W.'s parental rights.

1. P.S. shot C.W. in 1993, while she was intoxicated and pregnant with J.S. C.W. was arrested as a result, and pleaded no contest to assaulting P.S. He testified that he did not actually assault P.S., but entered the plea in order to prevent P.S.'s incarceration.

## II. FACTS AND PROCEEDINGS

J.S. was born April 30, 1993, to biological mother P.S. and biological father C.W. P.S. has a history of mental illness—including manic depression—and alcohol and substance abuse. C.W. has a history of alcohol and substance abuse and criminal violations—including five convictions for driving while intoxicated and a no-contest plea to a charge of assault against P.S.[1] In addition, a clinical psychologist, Dr. Frank Gonzales, testified that he performed tests on C.W., which show that C.W. has a verbal I.Q. of 73, has difficulty retaining information, and is "borderline deficient" in certain verbal skills.

J.S. was first taken into Alaska Department of Health and Social Services (DHSS) custody on July 17, 1995, after the Anchorage Police Department arrested P.S. for being intoxicated while caring for the child. After two days in foster care, J.S. was placed with his paternal grandmother. When DHSS took custody of J.S., C.W. was commercial fishing in Bristol Bay and was unavailable to care for his son.

In September 1995 DHSS caseworker Jason Allen located C.W. and explained the case plan to him. Allen testified that he perceived no lack of understanding on C.W.'s part and documented C.W.'s agreement to participate in the plan. C.W. did not challenge the case plan at that time.

In September 1995 both parents met with social worker Andrew Linn to discuss their case plan, and appeared intoxicated at the meeting. P.S. admitted using cocaine, and C.W. reported that he was scheduled for a substance abuse evaluation at Clitheroe Center. Linn sent both parents for a urinalysis test, which showed a high dilution rate [2] and inconclusive results. On May 26, 1996, the superior court accepted the stipulation of both parents to CINA adjudication. Both parents stipulated that their substance abuse problems and C.W.'s absence from the home created conditions that placed J.S. at sub-

2. Linn testified that a high dilution rate "is suspect for people who will drink a lot of fluids to attempt to flush drugs out of their system."

stantial risk of harm, and that although remedial services were being rendered by DHSS to promote reunification of the family, returning J.S. to the home would not be in his best interest at that time.

In 1995 and 1996 J.S.'s paternal and maternal grandparents shared custody. During this period, P.S. and C.W. were granted liberal visitation and DHSS made efforts to enable returning J.S. to their care by (1) monitoring drug usage for both parents—referring both to substance abuse treatment programs—and (2) addressing the mental illness of P.S.

In 1996 C.W. moved from Anchorage and had no contact with J.S., his social worker, or his lawyer in the CINA matter for more than three years. During this period, C.W. moved several times and was in and out of jail. He did not inform DHSS of his whereabouts and gave no forwarding address. C.W. explained at trial that he moved away because he learned that P.S. was using drugs again and feared that she would injure him as she had in the past or, alternatively, that his presence would be destabilizing, or "create problems" for J.S.

On April 30, 1998, DHSS returned physical custody of J.S. to P.S. In July 1998 P.S. called the police and reported that her adult male friend had sexually molested J.S. On July 20, 1998, DHSS returned J.S. to the custody of his maternal grandmother. Janet Mitchell—a licensed clinical social worker providing therapy for J.S.—diagnosed him with post traumatic stress disorder; she testified at trial that J.S. had been sexually abused for a period of two and one-half years while in the physical custody of P.S. and the legal custody of the state.

DHSS filed a petition to terminate the parental rights of P.S. and C.W. on July 27, 1999, and amended the petition on November 30, 1999. P.S. relinquished her parental rights before trial. C.W.'s motion for a visitation order was denied. The trial began

December 9, 1999, and concluded with a delayed session on February 8, 2000. The superior court permanently and irrevocably terminated all parental rights of P.S. and C.W. to J.S.

C.W. appeals.

## III. DISCUSSION

### A. Standard of Review

■■■■ We apply our independent judgment in reviewing questions of statutory interpretation, such as whether the superior court's findings comport with the requirements of the CINA statutes.[3] We review findings of fact in CINA proceedings for clear error.[4] Clearly erroneous findings are those that, upon "a review of the entire record[,] leave us with a definite and firm conviction that a mistake has been made."[5]

### B. Failure to Make Reasonable Efforts Tailored to C.W.'s Learning Disability

■■■■ C.W. argues that the state violated its duty under the CINA statute and the ADA to make reasonable efforts, tailored to his learning disability, to remedy his alcohol abuse problem and enable him to reunite with J.S.

Alaska Statute 47.10.088 allows a court to terminate parental rights "for purposes of freeing a child for adoption or other permanent placement." In order to terminate parental rights under the statute, a court must first find, by clear and convincing evidence, that (1) the child is a child in need of aid under AS 47.10.011,[6] and (2) the parent has not remedied the conduct or conditions that placed the child at risk.[7] Alaska Statute 47.10.086(a) requires that DHSS make "reasonable efforts to provide family support ser-

**3.** See A.B. v. State, Dep't of Health & Soc. Servs., 1 P.3d 677, 681 (Alaska 2000) (citing R.J.M. v. State, Dep't of Health & Soc. Servs., 973 P.2d 79, 84 (Alaska 1999)).

**4.** See R.J.M., 973 P.2d at 84 (citing In re S.A., 912 P.2d 1235, 1237 (Alaska 1996)).

**5.** Id. (citing S.A., 912 P.2d at 1237).

**6.** See AS 47.10.088(a)(1)(A).

**7.** See AS 47.10.088(a)(1)(B)(i).

vices" to the parent and child with the aim of preventing out-of-home placement.[8]

But even assuming AS 47.10.086(a) invariably requires DHSS to make reasonable efforts to reunite the biological family when the parent has abandoned the child,[9] it does not require DHSS to make greater efforts than it made in this case to locate C.W. after he had left town and lost contact with his son and those others involved with the CINA proceeding.

Title II of the ADA prohibits states from discriminating on the basis of disability in the provision of "services, programs, or activities." [10] The Code of Federal Regulations and the federal case law uniformly suggest that the reunification services provided by DHSS are "services" within the contempla-

tion of Title II.[11] Therefore, if the state had a duty under the statute to provide support services to remedy C.W.'s alcohol abuse, we assume for discussion purposes that it also had the duty under the ADA to provide these services in a manner that reasonably accommodated his alleged disability. But we need not decide here whether DHSS made reasonable efforts under the ADA to remedy C.W.'s alcohol abuse, because the order terminating C.W.'s parental rights rests independently on the superior court's well-supported findings that C.W. had abandoned his son, and that DHSS had made reasonable efforts under the circumstances to locate C.W. and to include him in the CINA proceeding.

The superior court found that J.S. was a child in need of aid under AS 47.10.011(1) [12]

---

**8.** AS 47.10.086(a) provides:

> Except as provided in (b) and (c) of this section, the department shall make timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate, if the child is in an out of home placement.

**9.** *Cf.* AS 47.10.086(c). That subsection provides:

> The court may determine that reasonable efforts of the type described in (a) of this section are not required if the court has found by a preponderance of the evidence that (1) the parent or guardian has subjected the child to circumstances that pose a substantial risk to the child's health or safety; these circumstances include abandonment. . . .

**10.** 42 U.S.C. § 12132 (1995) ("Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.").

**11.** *See* 28 C.F.R. § 35.102 (2001). That section provides:

> (a) Except as provided in paragraph (b) of this section, this part applies to all services, programs and activities provided or made available by public entities. (b) To the extent that public transportation services, programs and activities of public entities are covered by subtitle B of title II of the ADA (42 U.S.C. 12141), they are not subject to the requirements of this part.

> *See also Crawford v. Indiana Dep't of Corrections,* 115 F.3d 481, 483 (7th Cir.1997) (applying Title II to education programs for prisoners),

*overruled on other grounds by Erickson v. Board of Governors,* 207 F.3d 945, 948 (7th Cir.2000); *Duffy v. Riveland,* 98 F.3d 447, 455 (9th Cir. 1996) (prison disciplinary hearing); *Rodriguez v. DeBuono,* 44 F.Supp.2d 601, 614 (S.D.N.Y.1999) (state assessment program for home care services), *reversed on other grounds,* 197 F.3d 611, 618–19 (2d Cir.1999); *McNally v. Prison Health Servs.,* 46 F.Supp.2d 49, 58 (D.Me.1999) (prescription services provided by state detention center); *Civic Ass'n of the Deaf v. Giuliani,* 915 F.Supp. 622, 634 (S.D.N.Y.1996) ("As a remedial statute, the ADA must be broadly construed to effectuate its purpose.") (citation omitted).

**12.** AS 47.10.011 provides:

> Subject to AS 47.10.019, the court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to any of the following: (1) a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter. . . .
> Further, AS 47.10.013 provides:
> (a) For purposes of this chapter, the court may find abandonment of a child if a parent or guardian has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult. Abandonment of a child also includes instances when the parent or guardian, without justifiable cause,
> (1) left the child with another person without provision for the child's support and without meaningful communication with the child for a period of three months;
> (2) has made only minimal efforts to support and communicate with the child;

due to C.W.'s failure "to maintain regular visits for a period of three years" and the fact that C.W. "had not called, written letters, sent pictures, or participated in any kind of contact that would let the child know that his father was still around and that he still cares." The superior court concluded that in light of the three-year abandonment and C.W.'s failure to inform DHSS of his whereabouts, DHSS's efforts to provide C.W. services were reasonable.

The record supports the finding that DHSS's contact efforts were reasonable. After C.W. left Anchorage and his son in 1996, social workers continued to communicate with C.W.'s mother (whose address C.W. had used for mail and communication with DHSS) knowing that C.W. had contact with his mother and that through her, he would get the message that social workers wanted to speak with him about his case plan. Although it was not until the case goal had changed from reunification to termination that DHSS checked criminal records in what would ultimately be a successful effort to locate C.W. in jail,[13] C.W. admitted that he knew all along how to contact the caseworkers and his son if he so desired.

C.W. abandoned his child for more than three years, leaving DHSS no information concerning his whereabouts. And by the time C.W. reappeared, he had been separated from J.S. for so long that the court could reasonably conclude that no further efforts to reunite C.W. and J.S. could reasonably be expected to have remedied the harm that the abandonment had caused. Thus, as the state met its statutory obligations, AS 47.10.086 does not provide grounds for challenging the termination of C.W.'s parental rights.

Nor does the ADA provide such grounds. C.W. has never contended that his alleged disability affected the circumstances surrounding his abandonment. He advanced his ADA claim only with respect to DHSS's failure to make reasonable efforts to address his alcohol abuse problem. Because the superior court's findings concerning abandonment— including its finding of reasonable efforts— provided an independent basis for terminating C.W.'s parental rights, and because C.W.'s disability claim had no logical bearing on the abandonment findings, the court did not err in terminating C.W.'s parental rights on that ground, even assuming that DHSS's efforts to address his alcohol problem were unreasonable under the ADA and arguably precluded terminating his rights on the ground that his drinking made him an unfit parent.

### C. Remedy of Conduct that Placed J.S. at Substantial Risk of Injury

■ C.W. also argues that the superior court clearly erred in finding that he had failed to remedy his substance abuse problems, and in failing to recognize that by the time of trial he was "willing and able to care for [J.S.]."

In order to terminate parental rights under AS 47.10.088, a court must find by clear and convincing evidence that the parent:

(i) has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or

(ii) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the

(3) failed for a period of at least six months to maintain regular visitation with the child;
(4) failed to participate in a suitable plan or program designed to reunite the parent or guardian with the child;
(5) left the child without affording means of identifying the child and the child's parent or guardian;
(6) was absent from the home for a period of time that created a substantial risk of serious harm to a child left in the home;
(7) failed to respond to notice of child protective proceedings; or

(8) was unwilling to provide care, support, or supervision for the child.

13. *Cf. M.W. v. State, Dep't of Health & Soc. Servs.*, 20 P.3d 1141 (Alaska 2001) (affirming termination of parental rights where superior court found that DHSS's efforts to contact absent parent which included checking phone books, utility applications, permanent fund dividend applications, and criminal records, were reasonable efforts under statute).

parent would place the child at substantial risk of physical or mental injury.... [14] Here, the superior court found "clear and convincing evidence that [C.W.] ha[d] not remedied the conduct or conditions that placed [J.S.] at substantial risk of harm," as C.W. had "failed, within a reasonable period of time to successfully address his alcoholism addiction."

C.W. argues that the record, which reveals that he completed his treatment at Cordova House in October 1999 with a good prognosis for recovery, cannot support this conclusion. Although the record might support the conclusion that C.W. had remedied his alcohol dependence by the time of trial, there was also sufficient evidence indicating that he had not put his alcoholism behind him. The superior court reasonably found that C.W. had not remedied his alcohol dependency within a reasonable time because (1) since completing his first alcohol treatment program in 1997, C.W. has been twice convicted of driving while intoxicated, and (2) at the time of trial, he had not yet completed a subsequent treatment program. Regardless, even if the court had erred in failing to recognize that C.W. had remedied his substance abuse problems, this error would not justify reversal because the termination order rests on the independent and adequate statutory ground that C.W. abandoned J.S. C.W. has not argued that his act of abandonment was remedied such that it could no longer justify the termination of his parental rights.

### D. *Guardianship Arrangement*

■ C.W. also argues that the superior court erred in terminating his parental rights when the "less restrictive alternative" of guardianship was available. The guardianship issue was raised during an October 29, 1999 evidentiary hearing on C.W.'s motion for visitation. C.W.'s mother objected to granting custody of J.S. to the maternal grandparents and explained that she "would be more than willing to become guardian of [J.S.] until [C.W.] completed his case plan and could be [reunited] with [J.S.]." However, the issue was not properly raised at trial. C.W. offered no evidence regarding a guardianship arrangement at trial. In fact, the issue was not even mentioned until closing arguments, when C.W.'s counsel suggested that guardianship should be considered.

Although AS 47.10.110 permits a court to appoint a guardian for a child when it appears to the court that such an appointment would be in the child's best interest, AS 47.10.088 does not require that guardianship be considered in termination proceedings, except to the extent that the statute requires the court to order an arrangement that is in the child's best interest.

The superior court implicitly rejected the guardianship proposal when it denied C.W.'s visitation motion and continued custody of J.S. with his maternal grandparents. C.W. points to no evidence indicating that guardianship would have been in the best interest of J.S. or that it would have been in J.S.'s best interest to disrupt the stability and security he had enjoyed living with his maternal grandparents, with whom his therapist indicated that he had formed deep attachments. The superior court did not err in failing to order a guardianship arrangement.

### E. *Failure to Include a Visitation Arrangement*

■ C.W. also argues that it was error for the superior court to fail to incorporate a visitation plan into the termination order. But when adequate grounds for termination exist, there is no presumption that the parent should have visitation rights.[15] After parental rights have been fully terminated, the former parent has no residual rights at all— certainly the CINA statute provides for none. Because the CINA statute does not

---

14. AS 47.10.088(a)(1)(B).

15. *See* AS 47.10.084(c) (limiting residual parental rights, such as right and responsibility of visitation, to parents whose child is involved in CINA proceeding, but whose "parental rights have not [yet] been terminated by court decree"); *see also D.H. v. State*, 723 P.2d 1274, 1276 n. 6 (Alaska 1986) ("We recognize that a parent does not have an absolute right to visitation.") (citing *K.T.E. v. State*, 689 P.2d 472, 477 (Alaska 1984)). In both *D.H.* and *K.T.E.*, the court examined the subsection .084(c) visitation rights of parents whose parental rights had not yet been terminated.

expressly provide for post-termination visitation by biological parents, courts probably lack authority to order post-termination visitation.[16] Even if such authority exists under some circumstances, it may be exercised only to the extent that the authorized visitation is in the best interest of the child.[17]

The superior court ruled on C.W.'s motion to order visitation only one month before the termination trial began, and found by clear and convincing evidence that "[J.S.]'s welfare and best interests are served by disallowing parental visitation until approved by his current therapist Jan Mitchell." The court further ordered that "any visitation between [J.S. and C.W.] shall be allowed only under a structured program and as directed by Ms. Mitchell." At trial, Mitchell offered the opinion that a child's reconnection with an absent parent normally should not begin until the child is at least eighteen. C.W. does not persuasively show that it would be in J.S.'s best interest to have contact with him before the age of eighteen.

## IV. CONCLUSION

We AFFIRM in all respects.

16. See In re W.E.G., 710 P.2d 410, 415 (Alaska 1985) (construing original version of AS 25.23.130, which did not mention post-adoption visitation, and holding that statute foreclosed post-adoption visitation by biological relatives).

17. See K.T.E., 689 P.2d at 477 (holding that under CINA statute, even as to parents whose rights have not yet been terminated, AS 47.10.084(c) "should be read in conjunction with the rest of the chapter to allow parental visits to be barred when the visits are not in the best interests of the child"); see also In re A.F.M., 960 P.2d 602, 605–06 (Alaska 1998) (construing newly amended AS 25.23.130(c) which expressly empowers courts to authorize visitation among adopted children and their biological relatives when such visits are in best interest of children, and holding that subsection .130(c) does not confer right of visitation on biological parent).