STATE OF MAINE     RECEIVED & FILED         SUPERIOR COURT
ANDROSCOGGIN, ss.                           CIVIL ACTION
                    JAN 1 4 2004            Docket Nos. CV-02-117; CV-02-159
                                            EAG-AND-1/14 ...

JON SCOTT,           ANDROSCOGGIN
          Plaintiff  SUPERIOR COURT

          v.                                ORDER ON MOTION FOR
                                            SUMMARY JUDGMENT
ANDROSCOGGIN COUNTY JAIL et al.,            DONALD L. C...
          Defendants                        LAW L...

PROCEDURAL HISTORY AND BACKGROUND          JAN 30 2004

On July 8, 2002, Jon Scott filed a seventy-four paragraph complaint against the

Androscoggin County Jail and Androscoggin County. In his complaint, Scott asserted

that the defendants had violated the Maine Human Rights Act, 5 M.R.S.A. §§ 4553

et seq., (MHRA) and the Federal Americans with Disabilities Act, 42 U.S.C. §§12132 et

seq., (ADA) by refusing to comply with the medication-dosing schedule prescribed for

him while he was incarcerated at the jail between July 9 and July 28, 2000. This

complaint was served on the defendants on October 30, 2002. The returns of service

were filed with the court on November 12, 2003, after the ninety days allowed by M.R.

Civ. P. 3. Nonetheless, at the plaintiff's request, when the defendants failed to file

timely answers, the court clerk entered defaults against the defendants on March 18,

2003.

On September 11, 2002, Scott filed a second complaint against the Androscoggin

County Jail and Androscoggin County. In this complaint, Scott asserted that the

defendants had violated the MHRA and the ADA by refusing to comply with the

medication-dosing schedule prescribed for him while he was incarcerated at the jail

between September 11 and September 28, 2000. This complaint was also served upon

the defendants on October 30, 2002, and the returns of service were filed on November

12, 2002. When the defendants also failed to answer this complaint, and again at the plaintiff's request, the court clerk entered defaults against the defendants on March 18, 2003.

On March 21, 2003, defendants filed a motion to consolidate the cases and a consolidated motion to set aside default. The motion to consolidate was granted without objection. On April 25, 2003, the court granted the motion to lift default, over the plaintiff's objection. Discovery ensued and, on November 24, 2003, defendants filed a motion for summary judgment accompanied by eighty-three allegedly undisputed statements of material fact. Plaintiff filed his objection on December 16, 2003, accompanied by a twenty-three page document entitled "Plaintiff's Statement of Material Facts as to Which there are Genuine Issues to be Tried."

Neither of the parties has complied with the requirement for brief or concise statements. There are myriad disputes over Scott's reaction, if any, to the change in dosing schedules. Most of the defendants' statements about Scott's actions in jail are clearly not undisputed. The court will not spend any time trying to unravel what negative reactions Scott did or did not feel while at jail; any questions on that issue will be resolved in his favor.

The plaintiff's objection as to the materiality of the circumstances surrounding his initial incarceration is without basis. All of the information the jail had about Scott's medication needs—and his psychiatrist's willingness to provide such information—was an essential part of the jail's decision-making process. Therefore, the plaintiff's objections concerning materiality as to defendants' statements of material fact #3, 5, 6, and 7 are overruled.

In addition, plaintiff has "qualified" many of the defendants' proposed statements concerning the medication schedule with deposition testimony from Willard

2

Bredenberg, M.D. The issue presented by these cases is not which schedule was appropriate for Scott; the issue is whether the defendants violated Scott's rights while he was a prisoner at the jail. Therefore, the court overrules the qualifying remarks contained in plaintiff's response to defendants' statements of material fact #2, or 3.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

At all pertinent times in 1999 and 2000, Bredenberg was prescribing a number of psychotropic medications for Scott. DSMF 2. Scott was incarcerated at the Androscoggin County Jail in October 1999, February 2000, July 2000, and September 2000. DSMF 1. Just before Scott's first period of incarceration in October 1999, Bredenberg changed Scott's medication schedule from five times per day to three times per day. Scott's medication was provided to him at the jail in October 1999, as prescribed. DSMF 3. The parties disagree about Scott's reaction to this schedule.

When he returned to the jail in February 2000, Scott requested that he be given his medication five times per day. DSMF 4. After investigation, Jail Administrator Jon Lebel determined that there was no medical need to accede to Scott's request. DSMF 5[1]-7. However, because Scott was threatening to sue the County, Lebel eventually granted Scott's request for the last fourteen days of his incarceration. DSMF 8[2]; DSMF 9, as qualified by plaintiff.

On July 9, 2000, Scott began another period of incarceration that lasted until July 28, 2000. DSMF 10. Lebel decided that, during this period, he would defer to his medical staff's decision that Scott's request for five dosages per day should be denied. DSMF 11. Alfred Cichon, physician assistant at the jail, had earlier determined that there was no medical or scientific basis for the schedule Scott demanded. This

---

[1] Plaintiff's qualification to this asserted fact is not on point, and has been disregarded.

[2] Plaintiff's denial of the threats contains no record reference and has not been considered.

determination was based upon his consultation with physicians and pharmacists. DSMF 7. On July 12, 2000, Cichon, spoke with Dr. Bredenberg about Scott's demand for five doses per day. Bredenberg did *not* tell Cichon in July 2000 that the five doses were medically necessary. Bredenberg: 14:13-15. DSMF 13[3]. Scott had previously refused to allow Bredenberg to speak with jail personnel, so he believed he could not provide the information requested by the jail. Bredenberg: 13:5-24.

At approximately 3 A.M., within two hours of reporting to the jail on July 9, 2000, Scott gave affirmative answers to all six suicide-screening questions. DSMF 18. He also claimed to be hearing voices telling him to sue the County.[4] DSMF 19. Pursuant to 30 M.R.S.A. § 1559 and jail policy, Scott was not due to receive any medications until approximately noon on July 9, 2000. DSMF 21, 22, 23. At 11:46 A.M., Scott began hitting his head against the Plexiglas of his holding cell and demanding his medications. DSMF 24; Scott: 69:2-7. As a result of his stated suicidal intent, and these actions, Scott was held in the maximum security portion of the jail throughout this period of incarceration.

Throughout that period, his medications were provided three times per day. As mentioned above, on July 12, 2000, Scott's prescribing physician told the jail that the schedule Scott demanded was not medically necessary. However, because Scott was already complaining about the schedule, Dr. Bredenberg recommended that the jail watch him for serious symptoms. Bredenberg testified that the average patient who

---

[3] Plaintiff's objection is not supported by his record citations. Bredenberg 15:4-5 refers to Bredenberg's opinion as to the need for 5-times per day dosing in February 2000. In addition, whatever his thoughts, Bredenberg failed to provide that information to Cichon either in February 2000 or in July 2000.

[4] In his response to these proposed facts, Scott asserted that these statements were either facetious or "when [he] was not getting his medication and was feeling ill." PODSMF 18, 19. Scott appeared at the jail shortly after midnight on July 9, 2000. If he had been taking medication under the schedule he demanded, he would have taken his last dose approximately one hour earlier, at 11 p.m. His next dose was not due until 6 A.M. the following morning. Scott made his remarks at approximately 3 A.M.

4

suffered from Xanax withdrawal would evidence "a mild degree of anxiety and discomfort, perhaps some sweating, some mild nausea." Bredenberg: 16: 10-12. Therefore, he warned the jail to watch for projectile vomiting, inability to stand, and/or profound sweating. Bredenberg: 15: 18-20. Jail employees made visual checks of Scott every fifteen minutes while he was at the jail between July 9 and July 28, 2000. DSMF 28.

After July 12, 2000, and before his release sixteen days later, Scott made multiple complaints. He testified that he was sometimes sleepy and tired, which caused him to miss the jail's recreation period. Scott: 86: 7-9. He stated that he sometimes had difficulty breathing, and had transient loss of appetite. Scott: 86: 12-18. The jail logs show that he refused breakfast on July 17, 20, 21, and 25, and refused lunch on July 13 and 14. Lebel affidavit, ¶ 25. On July 14, he complained of kidney pains and stomach cramps. Bredenberg stated that the cramps might have been associated with the change in schedule, but he would have expected the symptoms to have begun sooner than then. Bredenberg: 5-17. On July 18, 2000, he complained of chest pain, difficulty with taking a deep breath, and vomited a small amount. ACJ progress note, Plaintiff's attachment M. Bredenberg testified that the chest pains and breathing difficulties were more likely due to Scott's anxiety than to the change in schedule. The vomiting might have been associated with the change in schedules. Bredenberg: 18; 22- 19:4.

On July 20, 2000, Scott complained that he had been sick all night, with vomiting and diarrhea. He did not complain during the night, and none of the jail personnel checking on him reported any problems. Bredenberg testified that those symptoms could have been related to the change in schedules. Bredenberg: 19: 8-15. On July 21, 2000, Scott complained of another difficult night, again, not noted by the guard assigned to watch him. Bredenberg testified that these symptoms could be associated with the

change in schedules. Bredenberg: 20: 9- 18. Throughout this incarceration, Scott informed jail personnel numerous times that he had an attorney and would be suing the jail for violating his rights.

On September 11, 2000, Scott returned to the jail, and remained there until September 28, 2000. DSMF 49. Before arriving, Scott notified Lebel, in writing, that he was entitled to receive his medication five times per day, pursuant to the ADA and MHRA. DSMF 50. He also provided Lebel with a letter from Bredenberg that stated that Scott had a medication schedule that "worked best with five daily doses between 6 A.M. and 11 P.M." The letter also stated that medical staff at the jail had witnessed projectile vomiting from Scott when he was last incarcerated. DSMF 51.

Because Cichon did not believe that any of the symptoms Scott had complained of had actually occurred, or that any of the medical staff had witnessed projectile vomiting, because Bredenberg had never told him that the five doses per day were medically necessary, and because he had determined that no pharmacological studies supported the schedule Scott demanded,[5] Cichon determined that the five doses per day were not medically necessary during Scott's incarceration in September 2000. DSMF 52. After his entry into the jail on September 11, 2000, Scott's first complaint of symptoms was made on September 23, when he complained of chest pains and shortness of breath. Bredenberg believes that those symptoms were caused by anxiety rather than by Xanax withdrawal. Bredenberg: 21: 6-12. Bredenberg also testified that, if a person were suffering from the change in dosing schedule, the symptoms would start immediately. Bredenberg: 17: 2-7.

---

[5] At his deposition, Dr. Bredenberg agreed that there was no clinical or scientific reason for the schedule Scott had demanded. Bredenberg: 33; 9-14.

Scott's two other complaints during that September 2000 incarceration were his refusal to eat lunch on September 25 and his refusal to eat breakfast on September 26. Bredenberg testified that a loss of appetite caused by Xanax withdrawal would occur daily, start a few hours after one dose, and last until he got the next. Bredenberg: 21:13-22:5.

Bredenberg also agreed that Scott's expectation that the schedule would not occur as he wished might, on its own, cause him to feel anxiety, panic or physical discomfort. He also testified that the symptoms Scott complained of are those of a panic attack. Bredenberg has never diagnosed Scott with drug withdrawal. Bredenberg: 38:6-22. He testified that the symptoms Scott described, if accurate, were not due to withdrawal, but were due to a return of the symptoms the medication was intended to suppress, including panic and anxiety. In addition, when asked about the possible effect of "overdose," he stated:

> The reason for not giving a higher dose and trying to do that on the outside was that above a certain dose he wouldn't be safe to drive or he might be sleepy or even light-headed after a larger dose so he couldn't function on the outside, but in the jail cell it doesn't matter if he gets sleepy after his larger dose. He's not going to be driving or operating machinery so it would be reasonable to attempt that.

Bredenberg: 43: 5-12.

## DISCUSSION

The defendants are entitled to summary judgment if the record presented demonstrates that there are no genuine issues of material fact, and that they are entitled to judgment as a matter of law. In *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, 711 A.2d 842, the Law Court stated:

> Where a plaintiff will have the burden of proof on an essential issue at trial, and it is clear that the defendant would be entitled to a judgment as a matter of law at trial if the plaintiff presented nothing more than was before the court at the hearing on the motion for a summary judgment, the

7

court may properly grant a defendant's motion for a summary judgment. *See Town of Lisbon v. Thayer Corp.*, 675 A.2d 514, 517 (Me. 1996); *Gerber*, 584 A.2d at 607; *see also* M.R. Civ. P. 50(a). To avoid a judgment as a matter of law for a defendant, a plaintiff must establish a *prima facie* case for each element of her cause of action. *See Fleming v. Gardner*, 658 A.2d 1074, 1076 (Me. 1995). A judgment as a matter of law in a defendant's favor is proper when any jury verdict for the plaintiff would be based on conjecture or speculation. *See id.; Barnes v. Zappia*, 658 A.2d 1086, 1089 (Me. 1995).

*Champagne, supra,* at ¶ 9, 845. Scott's complaint seeks compensatory damages, civil penalties, costs, and attorney fees for alleged violations of the ADA and MRHA. The MRHA states that its policy is:

> To protect the public health, safety and welfare, it is declared to be the policy of this State to keep continually in review all practices infringing on the basic human right to a life with dignity, and the causes of these practices, so that corrective measures may, where possible, be promptly recommended and implemented, and to prevent discrimination in employment, housing or access to public accommodations on account of race, color, sex, physical or mental disability, religion, ancestry or national origin; and in employment, discrimination on account of age or because of the previous assertion of a claim or right under former Title 39 or Title 39-A and in housing because of familial status; and to prevent discrimination in the extension of credit on account of age, race, color, sex, marital status, religion, ancestry or national origin; and to prevent discrimination in education on account of sex or physical or mental disability.

4 M.R.S.A. § 4552. Scott claims, and the county agrees, that he suffers from a physical or mental disability as it is defined in 4 M.R.S.A. § 4553(7-A). The statute establishes that it is unlawful public accommodations discrimination:

> For any public accommodation or any person who is the owner, lessor, lessee, proprietor, operator, manager, superintendent, agent or employee of any place of public accommodation to directly or indirectly refuse, discriminate against or in any manner withhold from or deny the full and equal enjoyment to any person, on account of race or color, sex, physical or mental disability, religion, ancestry or national origin, any of the accommodations, advantages, facilities, goods, services or privileges of public accommodation, or in any manner discriminate against any person in the price, terms or conditions upon which access to accommodation, advantages, facilities, goods, services and privileges may depend.

4 M.R.S.A. § 4592(1). Unlawful discrimination also includes, but is not limited to:

A qualified individual with a disability, by reason of that disability, being excluded from participation in or being denied the benefits of the services, programs or activities of a public entity, or being subjected to discrimination by any such entity;

4 M.R.S.A. § 4592(1)(E). The ADA statute states:

Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (2003).

Scott claims that, by failing to provide him with the dosing schedule he requested, the defendants subjected him to discrimination under both of these statutes. Because the standards to be applied are the same, the court will address the combined claims together. *See, e.g., Ridge v. Cape Elizabeth School Dist.*, 77 F. Supp. 149 (D. Me. 1999); *Parker v. Universidad de Puerto Rico*, 225 F.3d 1(1st Cir. 2000).

Mental health services provided by correctional facilities to incarcerated persons are "services, programs, or activities of a public entity" within the meaning of the ADA. *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001). The provision and withholding of medications also fall within this interpretation. *McNally v. Prison Health Servs.*, 46 F. Supp. 2d 49 (D. Me. 1999), *reconsideration denied*, 52 F. Supp. 2d 147 (D. Me. 1999).

As a qualified individual, in order to state a claim under the ADA, Scott must establish: (1) that he was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against; and, (2) that such exclusion, denial of benefits, or discrimination was by reason of his disability. 42 U.S.C. § 12132. To state a claim under the MHRA, he must establish the same factors. Scott has asserted that the defendants discriminated against him

9

when they denied his requested accommodation, because their failure evidenced deliberate indifference.

The United States Supreme Court explained the constitutional standard for deliberate indifference claims in two cases: *Estelle v. Gamble*, 429 U.S. 97, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976) and *Farmer v. Brennan*, 511 U.S. 825, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994). *Estelle* stated that the Eighth Amendment protection requires the government "to provide medical care for those whom it is punishing by incarceration." 429 U.S. at 103. In *Farmer* the Court explained the standard Scott must meet to hold a jail liable. First, the deprivation alleged must be "objectively 'sufficiently serious.'" 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 115 L. Ed. 2d 271, 111 S. Ct. 2321 (1991)). Second, the defendant must have a culpable state of mind, which means that the defendant was deliberate in its indifference to the inmate's health or safety. *Id.*

There is no factual dispute about the jail's actions: it gave Scott all of the medication prescribed for him by his treating psychiatrist, but dosed him three times per day rather than five times per day. For purposes of this motion, the court will assume that Scott suffered all of the symptoms mentioned above and, for purposes of this motion, the court will also assume that some of those symptoms, *i.e.*, the ones identified by Dr. Bredenberg as possibly linked to the schedule change, were actually caused by the change in his medication schedule. Both of these assumptions are strongly challenged by the defendants. However, on a motion for summary judgment, the court must review the record in the light most favorable to the non-moving party.

The first question to be addressed, therefore, is whether Scott's demand for a different medication schedule falls within the definition of serious medical needs or a genuine need for accommodation. In *Sires v. Berman*, 834 F.2d 9 (1st Cir. 1987), an inmate argued that the institution's refusal to provide a nurse to apply nitro paste met

the definition. The United States District Court for the First Circuit disagreed, holding that the inmate had failed to present any evidence of a serious medical need that went unmet. In its decision, the court cited *Estelle v. Gamble*, 429 U.S. 97 (1976), and noted with approval the trial court's finding that the petitioner's claim was, "at worst, a case of a petty squabble with an overworked, or even rude, nurse, something not foreign to the experience of many of us not in prison, and certainly not an indifference that can offend "evolving standards of decency." *Sires, supra,* at 13. In *Chambers v. Warden,* 2002 DNH 150, 2002 U.S. Dist. LEXIS 15025, *Aff'd., Chambers v. Coplan,* 2003 U.S. App LEXIS 26244 (1st Cir. 2003), a magistrate found that a one-armed prisoner with back, leg, and ankle pain who had difficulty using the faucet in his cell had failed to establish a serious medical need.

The record presented provides no support for plaintiff's claim that he was in need of the accommodation requested. Scott received all of the medication prescribed for him each day. In both July and September, the jail's decision to provide the medication three times per day rather than five times per day was made after consultation with Scott's psychiatrist, and after investigation by the jail's medical staff. At no time before any of Scott's incarcerations did Dr. Bredenberg tell the defendants that the schedule Scott requested was medically necessary. At no time did he tell the jail that its schedule was inappropriate. Scott's assertions, at best, amount to a disagreement about the proper course of treatment:

> To append labels like "wanton" or "deliberate indifference" to this conduct, when nothing suggests that the medical judgment was absurd or that improper reasons were given for refusing treatment, cannot alter what is in essence a claim of negligence.

*Watson v. Caton,* 984 F. 2d 537, (1st Cir. 1993).

11

Even if the court found that the demanded accommodation was necessary to address a serious medical need, however, Scott cannot establish that the jail's failure to meet that need was actionable. To establish deliberate indifference to a serious medical need, the plaintiff would have to be able to establish that the jail's decision to impose the schedule denied him "needed medical care" in order to punish him, or that the jail's decision to adhere to the three-times-per day schedule was made wantonly because it knew that to do so would harm him. *Watson v. Caton, supra.*

Contrary to the plaintiff's argument, the issue is not whether the schedule imposed by the jail was reasonable. The issue is whether the jail's decision on that schedule was actionable. The jail's initial decision to impose and maintain a three-times per day medication schedule in July was based upon the opinion of its medical staff, made after consultation with Dr. Bredenberg. DSMF 15. As noted above, plaintiff's objection to DSMF 15 is not supported by his record citations. Bredenberg 15:4-5 refers to Bredenberg's opinion as to the need for a five-times per day dosing in February 2000. Bredenberg testified, however, that he told Cichon in July 2000 that it was *not* medically necessary for Scott to receive his medications five times per day. Bredenberg's advice was based upon his understanding that Scott would be watched, and that the jail would change his schedule if he began demonstrating "untoward reactions such as the projectile vomiting, [inability] to stand up, profound sweating...." Bredenberg: 15:18-20. The court is convinced that, on this record, there is no evidence from which a jury could infer that the jail's decision to impose a three times per day schedule in July was based upon a discriminatory motive or evidence of deliberate indifference.

In preparation for his September incarceration, Scott had Dr. Bredenberg write a letter explaining his medication requirements. In that letter, dated September 7, 2000, Bredenberg wrote:

12

Jon Scott has a medication schedule that works best when he takes medicine FIVE TIMES DAILY BETWEEN THE HOURS OF 6 A.M. AND 11 P.M.

Previous attempts to streamline this schedule and give the medicines three times daily have resulted in the following complaints from Mr. Scott: He reports developing excruciating head pain, projectile vomiting, diarrhea and dizziness. He claims that the projectile vomiting was observed by Barbara, one of the staff members in the Medical Unit of the Androscoggin County Jail when he was last there in July.

I discussed this matter with both Barbara and another staff member, Al, on July 12, 2000, shortly after Mr. Scott entered the jail for his most recent stay. Al proposed a "special staff watch", so that staff would be aware if any severe or untoward reaction occurred. I recommended that if projectile vomiting did indeed occur, it would constitute honoring Mr. Scott's request to continue his **five times daily** medication schedule, uninterrupted.

It is my understanding that Mr. Scott will enter the Androscoggin County Jail again on Monday, September 10, 2000. Please give the above recommendation serious and careful attention.

The jail medical staff did not believe that Scott had suffered any of the symptoms he complained of during the July stay. Based on that belief, and because Bredenberg had not stated, either in July, or in this letter, that placing Scott on a different schedule was medically necessary, the jail decided that the administration of medications to Scott would occur three times per day.

The record presented demonstrates the actions taken by the jail in making its decision not to grant Scott's request were based upon sound medical judgment. Cichon undertook an investigation of the normal dosing of the medications prescribed, and also consulted Scott's prescribing physician. When he advised Lebel that there was no clinical or scientific reason to give Scott his medications five times per day, he was correct. DSMF 65.[6] His uncontroverted actions belie any attempt by the plaintiff to

---

[6] Plaintiff's denial is not on point, and his statements in response do not affect the veracity of this statement.

establish that the jail's decision was due to deliberate indifference or an intent to discriminate.[7]

Even if the court assumes that Scott complained to the jail of all of the physical and psychological symptoms he has claimed, the treatment provided by the jail was, at worst, negligent and as such, is not actionable. As Magistrate Kravchuk stated in a recent decision: "It seems to be no more than a dispute about the proper course of treatment and [the inmate's] discontent with [the provider's] skepticism towards his condition." *Dellairo v. Garland*, 2003 U.S. Dist. LEXIS 7753 (May 7, 2003).

## ORDER

For the reasons stated above, defendant's motion for summary judgment is granted.

The clerk is directed to incorporate this order by reference in the docket for this case.

Dated: *January 14, 2004*

_____
Ellen A. Gorman
Justice, Superior Court

plt.
*Stuart Tisdale*
*Mary Davis*

def.
*Michael Schmidt*

---

The defendants have asserted that their actions were not based upon an intent to discriminate. DSMF 83. Plaintiff objected to this assertion, but the record citations accompanying that objection do not support his assertion. None of the record provided provides a basis for that assertion.

14