### DOUG Y., Appellant,

v.

### STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–13701.

Supreme Court of Alaska.

Dec. 3, 2010.

---

Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Appellant.

Laura C. Bottger, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee.

Anita L. Alves, Assistant Public Advocate, Anchorage, and Rachel Levitt, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: FABE, WINFREE, and CHRISTEN, Justices.

*OPINION*

CHRISTEN, Justice.

## I.  INTRODUCTION

This is a case involving the termination of parental rights of Damien's father, Doug.[1] Doug does not contest that Damien is a child in need of aid under AS 47.10.011(6) and (8) resulting from his excessive punishment; he does contest that Damien is a child in need of aid under AS 47.10.011(10). Doug also argues that the Office of Children's Services did not sufficiently assist him in complying with his case plan. Having reviewed the record, we affirm the superior court's judgment terminating Doug's parental rights.

## II.  FACTS AND PROCEEDINGS

Damien was born on November 8, 2000. He is the only child of Abigail and Doug. Damien is not an "Indian child" under the Indian Child Welfare Act.[2] Abigail relinquished parental rights on August 18, 2009 and is not a party to this case.

Abigail and Doug never married. During their relationship, Doug was arrested and jailed for domestic violence, including one incident of domestic violence when Damien was present in the room. In August 2004 Abigail filed for a protective order against Doug alleging that he assaulted her physically and mentally. At that time the court ordered OCS to investigate allegations of child abuse.[3]

### A.  Doug's First Interaction With OCS

Damien was first placed under the protection of OCS after a Head Start report in September 2005; he was four years old. Head Start contacted OCS after Damien complained that his bottom hurt. The OCS investigator examined Damien and found raised red and purple bruises on his bottom. Damien reported that Doug used a wooden spoon to beat him as a form of discipline. OCS immediately took Damien into emergency custody. After contacting his family, OCS placed Damien with his paternal step-grandmother, Joan.

OCS developed a case plan for Doug directing him to services including anger management and parenting classes. OCS also recommended that Damien begin counseling, making a referral for Damien and attempting to enroll him with a counselor. Doug refused to agree to counseling for Damien. He told the social worker that he would not agree for Damien to go to counseling unless Abigail went to counseling. Family counseling was presented as an option and Abigail agreed to engage in the sessions, but Doug never followed through. However, Doug completed his parenting classes and anger management classes and in July 2006 Damien was released to Doug's custody.

### B.  Doug's Second Interaction With OCS

Just over a year later, on August 30, 2007, OCS again became involved with Doug when Chester Valley Elementary School contacted the Anchorage Police Department (APD) and reported that Damien had suffered injuries. The responding APD officer took photographs of Damien showing extensive welts and bruises on his back, torso, bottom, and arms. Doug admitted that he used a leather belt to repeatedly hit Damien as punishment for receiving a disciplinary note at school. Damien told the OCS social worker "he wanted his dad to go to jail so his dad would quit beating him."

---

1. Pseudonyms are used to protect the privacy of family members.

2. 25 U.S.C. § 1903(4) (2006).

3. The record does not reflect any results of the investigation.

Doug was arrested and charged with domestic violence assault and child abuse. He pled no contest to the domestic violence assault charge and stipulated that Damien was a child in need of aid under AS 47.10.011(6). The stipulation was adopted by the superior court in April 2008.

Damien was taken into OCS custody on September 5, 2007 for the second time in less than two years, and he was again placed in the custody of his grandmother Joan. Upon returning to his grandmother's care, Damien expressed excitement that his father would no longer be able to beat him. He said he was happy his father was in jail.

In the months that followed, Damien remained in fear and exhibited separation anxiety. Joan noticed that she "literally could not go to the restroom without him sitting outside the door crying and saying someone is going to get him." Damien had nightmares about his father coming to beat him again. The nightmares were severe enough that he would wake his grandmother to have her check that the burglar alarm was on. At other times, Damien approached his grandmother and asked her to beat him like his father would, once looking for a belt to bring to her. Damien had behavioral problems at school and at home during this period.

In September 2007 Damien was given a mental health examination by Staci Miller, LPC. Miller did not diagnose Damien with post-traumatic stress disorder (PTSD) but she opined that Damien might receive this diagnosis if more information became available. Miller referred Damien to the Anchorage Community Mental Health Services Trauma Center (Trauma Center) for individual and family therapy. She also recommended continued therapeutic support through On Target, a cooperative program between his school and a local mental health center.

Miller recommended against Doug visiting Damien. She noted Doug's "disregard for appropriate parenting help and not taking responsibility for removals." She also highlighted Damien's "fear of his father." Miller was concerned that visitation would be detrimental to any progress that Damien would hopefully make in "a stable, non-abusive environment and therapy."

Based on Miller's recommendation, Damien began therapy with Kristin Howard, LPC at the Trauma Center. Howard, like Miller, recommended that Doug not have visitation with Damien because it was against Damien's best interest. During therapy sessions, Damien repeatedly expressed fear of his father, fear of being sent back to live with his father, and fear that he would be subjected to beatings.[4] Damien was plagued by "nightmares of his father drowning him, killing him, hurting him, [and] beating him." During therapy sessions he often manifested classic signs of PTSD including physiological arousal (rapid heartbeat and shaking) and avoidant behavior (lowering his head in shame and refusing to talk). Howard diagnosed Damien with PTSD and attention deficit hyperactivity disorder (ADHD).[5]

Howard noted that Damien showed progress and improvement during her sessions but was prone to return to problem behavior when confronted with abuse triggers. Damien's triggers included Doug's facial expressions or seeing Doug's belt. Damien told Howard that "every time he closed his eyes he would see his father beating him." By April 30, 2009, Howard assessed that Damien still did not feel safe around his father.

Howard focused on developing a sense of security and stability in Damien. She worked on family therapy with Joan and Damien to increase his sense of security and attachment. Focus was also placed on developing "routines and rituals in his life to help him feel safe." Work was done to "help create physical and emotional safety in the home, and school, and in the clinic and the community." Howard helped Damien develop coping strategies for moments when his PTSD was triggered. The overarching goal

4. He continued to express these fears as late as May 2009.

5. North Star Behavioral Health later adjusted his diagnosis to include bipolar disorder not otherwise specified on June 22, 2009. Howard seemed skeptical of the addition of bipolar disorder to Damien's diagnosis.

was to help Damien attain a sense of safety and stability.

In addition to individualized therapy, Damien received school and social services. He participated in On Target to help reduce anxiety at school, and received psychiatric services to help with his PTSD and ADHD. Alaska Children's Services provided intensive rehabilitation, including case management and family skill development. All of these services were aimed at dealing with Damien's mental health issues and sense of security and stability.

### C. Doug's Case Plan

Following the September 2007 removal, Doug received a psychological evaluation as part of his OCS case plan. The stated permanency goal of the case plan was "reunification." In November 2007 Dr. Michael Rose conducted a psychological evaluation of Doug as part of the case plan. His report was provided to OCS in February 2008.

Dr. Rose reviewed mental health records, interviewed Doug twice, and administered a battery of diagnostic testing. He ultimately diagnosed Doug as meeting the diagnostic criteria for child abuse and personality disorder not otherwise specified with antisocial features. His assessment indicated that Doug did "not appear to be in a position to independently care for [Damien] . . . and it is difficult to know if he will be able to make changes that will allow him to appropriately parent his son in the future." He observed that Doug "has had multiple opportunities to make changes in his parenting practices and to enter family therapy to address problems between [Damien] and himself but has apparently made few if any [changes]." Dr. Rose linked Damien's PTSD to Doug's abusive practices, concluding that "exposing [Damien] again to the possibility of further physical or psychological abuse by [Doug] may be entirely too risky."

Based on his evaluation Dr. Rose concluded that it was "doubtful [Doug] will be able to make the changes necessary to effectively parent [Damien] in the future." He nonetheless provided five recommendations to help Doug "get into a position to care for [Damien]." Dr. Rose's first recommendation was that Doug address financial and housing issues. Doug was unemployed and living with his father at the time. The second recommendation was that Doug "enter individual psychotherapy to address his Personality Disorder with antisocial features, anger management difficulties, and low frustration tolerance." He cautioned that Doug would "require a considerable treatment period to properly address [these issues]." He also warned that "individuals with [Doug's] diagnoses are difficult to successfully treat, and they are typically resistant to virtually any form of psychological intervention." He concluded that "[u]nless [Doug] can make significant progress toward addressing his psychological and life adjustment problems, it is unlikely he will be able to satisfactorily meet [Damien's] needs." The third recommendation was that Doug needs to appreciate "the nature and extent of [Damien's] psychological problems" and the role he played in contributing to them. The fourth was that Doug "abstain from the use of all substances since he may be addiction-prone." Finally, Dr. Rose recommended that once Doug made "demonstrable and consistent progress" with the first four objectives that he be allowed supervised visitation with Damien.

Dr. Rose's recommendations were incorporated into a revised case plan dated February 2008. The revised case plan continued to set a goal of reunification, and made clear that Doug needed to make "substantial progress with his mental health therapy" before he could progress to reunification. A revised May 2008 case plan continued with the goal of reunification. By August 2008 OCS's recommendation for Damien's permanency plan shifted to the concurrent goals of adoption and reunification, with an observation that given "the parents' lack of engagement in case plans, the goal of adoption is recommended over reunification."

### D. Doug's Visitation With Damien

Doug was not allowed any visitation with Damien until late January 2008. Visitation was permitted only after Damien stabilized to some extent and options for therapeutic supervised visits had been explored and rejected as unfeasible. OCS made the decision

to allow supervised visitation after consulting with Howard. Doug was asked to write letters to his son before visitation began, but the first letter Doug wrote was deemed inappropriate and was not shared with Damien. The second letter was appropriately nurturing and supportive, and Howard shared it with Damien. The expectation was that Doug would continue to write letters, but he never did.

Doug missed several visits. As a result, OCS imposed a rule requiring that Doug arrive 30 minutes early to each visit to avoid upsetting and disappointing Damien if Doug did not arrive. Eventually Doug was able to establish consistency and was permitted to simply call and confirm that he was coming to a visit. Doug's supervised visits generally went well. But during one visit David Pieper, a supervising OCS social worker, found Doug to be overly rigid and controlling. Gail Davis, another OCS supervisor, expressed concern that Doug was sometimes rigid and overly focused on the same issues, which upset Damien.

The visits influenced Damien's behavior. After visits he would often cry at school and need to talk about his feelings. Howard felt the visits made Damien miss his father while also functioning as trauma triggers; after visits were established, Damien continued to report PTSD symptoms, had nightmares about his father killing him, drew pictures of his father hurting him, and feared someone was coming to get him.

Damien's teacher reported the visits were more disruptive and upsetting to Damien than to other children who had supervised OCS visitations. In his view, while other children were upset because they wanted to visit with their parents, Damien's anxiety did not arise from the same feelings. He described that before visits, Damien was nervous and withdrawn, cried easily, and said he did not want to go. When he returned from visits, Damien was withdrawn, very sensitive to space, easily agitated, and cried. Damien told his teacher that the visits were stressful because he was afraid of his father.

Joan functioned as a visitation supervisor during a November 2008 basketball game that Doug wanted to attend. Before attending the game Doug was instructed not to discipline Damien in any way. But during the game Doug felt Damien was being disrespectful to his coach, and he verbally reprimanded Damien. The incident upset Damien because he was concerned his father may hurt him. Damien burst into tears and would not go out to play at the start of the second half. After the incident, Joan refused to supervise any future visits.

## E. Doug's Visitation With Damien Ends

In early March 2009 Damien called Dave Pieper, his OCS social worker, to report an incident that occurred during a restroom break at a recent OCS supervised visit. Pieper later testified that Damien called while on vacation with his grandmother, reported that "he was really scared ... [and] ... would feel better if he could just tell somebody" that during a recent OCS visit he went to the restroom with his father who told him, "if he keeps talking and telling people what—what had happened that dad would hunt him down." Pieper testified that Damien reported feeling better after sharing this information. Pieper immediately relayed the information to his supervisor and Howard.

The incident and Damien's feelings about the incident led Pieper, his supervisor at OCS, and Howard to agree to stop Doug's visitation. Howard noticed that after the incident Damien was decompensating quickly and was at risk for hospitalization. The goal of stopping visitation was to stabilize Damien and reduce the stressors in his life.

On April 20, 2009, Howard indicated that Damien would continue to need therapy to address his PTSD. She also concluded that his therapy would only be successful if he attained psychological safety, which would not be possible with uncertainty about his permanent placement. In her view, permanent placement and stability were necessary for Damien to begin to fully heal from the trauma he had suffered. Howard believed that Damien had a good prognosis as long as he was not exposed to "any further traumatic events and he has a stable caregiving system

that understands his psychological needs and can respond to him in a safe manner."

In May 2009 Damien was hospitalized at North Star Behavioral Health for 40 days to stabilize his medication. Damien returned to Joan after his discharge from North Star Behavioral Health, and was able to use coping skills to remain calm.

### F. Termination Of Doug's Parental Rights

OCS's August 11, 2008 report for permanency hearing stated that if Doug was "unsuccessful in [his] quest to regain custody of [Damien] and [Damien] is unable to demonstrate an ability to be reunified, [OCS] would seek to accomplish an adoption." The report noted that Doug had "not made substantial progress in his case plan," stating that "he has not engaged with [his] therapist." Doug did not dispute that he failed to engage in the therapy required by his case plan, but asserted that he "has made the changes necessary internally on his own." OCS reported that AS 47.10.088(d) required OCS to file a petition for termination of parental rights because Doug had "made little or no effort to remedy his ... conduct by the time of the permanency hearing."

After the September 2007 removal, Doug only attended four sessions with his mental health therapist Linda King—one in 2007, two in March 2008, and one in April 2009. The case plan also required Doug to complete anger management therapy, but he only attended some of the initial anger management classes. Doug participated in a substance abuse program at the Salvation Army's Clitheroe Center, but was discharged for testing positive for marijuana and reporting alcohol use. A substance abuse assessment after his discharge from the Clitheroe Center recommended continued treatment and monitoring of Doug's marijuana use. Doug was referred for urinalysis testing twice a week. He tested positive for marijuana on several occasions and missed many scheduled tests.

Doug made some progress toward establishing greater financial security by enrolling in an apprentice program and other training. But he had limited success in obtaining regular employment, and he left employment that paid $10 an hour because he thought it did not pay enough.

OCS filed a petition for termination of parental rights in February 2009. The termination of parental rights trial was held on July 15–17, July 27, August 18, and August 21, 2009. At the end of the trial, the superior court terminated Doug's parental rights to Damien. It found by clear and convincing evidence that Damien was a child in need of aid under AS 47.10.011(6) (physical harm), and (10) (substance abuse); that Doug failed to remedy the conduct that placed Damien at risk of harm; and that OCS made reasonable efforts in support of reunification. The superior court also found by a preponderance of the evidence that it was in Damien's best interest to terminate Doug's parental rights. The superior court subsequently made permanency findings that placement of Damien with his grandmother Joan was in Damien's best interests, and instructed counsel to relay that finding to Damien so that he would not worry about being returned to his father's care.

Doug appeals.

### III. STANDARD OF REVIEW

In a child in need of aid (CINA) case, we review a superior court's findings of fact for clear error.[6] Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the party prevailing below leaves this court "with a definite and firm conviction that a mistake has been made."[7] We review de novo whether a trial court's findings satisfy the statutory requirements of the CINA statutes.[8]

**6.** *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 88 P.3d 527, 529 (Alaska 2004) (citing *A.B. v. State, Dep't of Health & Soc. Servs.,* 7 P.3d 946, 950 (Alaska 2000)).

**7.** *Id.* (quoting *A.B.,* 7 P.3d at 950).

**8.** *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 102 P.3d 932, 935 (Alaska 2004).

## IV. DISCUSSION

Before the superior court may terminate parental rights, OCS must prove three elements by clear and convincing evidence. OCS must prove: (1) that "the child has been subjected to conduct or conditions described in AS 47.10.086" making the child a "child in need of aid"; [9] (2) that the parent "has not remedied the conduct or conditions in the home that place the child at substantial risk of harm"; [10] or "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child at substantial risk of physical or mental injury"; [11] and (3) that OCS has made reasonable efforts under AS 47.10.086 to provide family support services to the child and to the parents of the child designed to enable the safe return of the child to the family home.[12] OCS must also prove by a preponderance of the evidence that termination of parental rights is in the best interests of the child.[13] Doug challenges each element of the superior court's findings relating to the termination of his parental rights.

### A. A Finding That Damien Is A Child In Need Of Aid Under Any Part Of AS 47.10.011 Is Sufficient To Support Termination.

The superior court found that Damien was a child in need of aid under AS 47.10.011(6) (physical harm) and (10) (substance abuse) based on Doug's conduct. Doug concedes that Damien is a child in need of aid under AS 47.10.011(6) (physical harm) and (8) (mental injury) as a result of his excessive discipline. But Doug disputes the superior court's finding under AS 47.10.011(10) (substance abuse).

A finding that a child is a child in need of aid under any part of AS 47.10.011 is sufficient to support termination.[14] Doug's concession that Damien is a child in need of aid under AS 47.10.011(6) (physical harm) is sufficient to support the termination order, making review of the finding under AS 47.10.011(10) (substance abuse) unnecessary.

### B. Doug Did Not Remedy The Conduct That Placed Damien At Substantial Risk Of Harm.

■ The superior court found that Doug failed to remedy the conduct that placed Damien at risk of harm. Doug argues that it was clearly erroneous for the superior court to find that he had not remedied his conduct or could not remedy it within a reasonable period of time.

In making a determination that a parent failed to remedy the conduct or conditions that place the child at substantial risk of harm we may consider five factors under AS 47.10.088(b):

(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age and needs;

(2) the amount of effort by the parent to remedy the conduct or the conditions in the home;

(3) the harm caused to the child;

(4) the likelihood that the harmful conduct will continue; and

(5) the history of conduct by or conditions created by the parent.

We note "the best interest factors listed in the statute are not exclusive and the superior court need not accord a particular weight to any given factor."[15] The superior court

---

9. AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

10. AS 47.10.088(a)(2)(A); CINA Rule 18(c)(1)(A)(i).

11. AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A)(ii).

12. AS 47.10.088(a)(3); CINA Rule 18(c)(2)(A).

13. AS 47.10.088(b), (c); CINA Rule 18(c)(3).

14. *See Alyssa B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 165 P.3d 605, 618 (Alaska 2007) ("Because either [CINA] finding alone would support the termination order and because [appellant] does not challenge the court's finding of abandonment, her challenge to the mental illness finding has no impact on the outcome of the case."); *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 902 n. 7 (Alaska 2003) ("Sherry also makes an argument concerning her personality disorder, however, because we affirm the trial court's decision on other grounds, we do not address this argument.")

15. *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1263 (Alaska 2010).

must "consider the best interests of the child"[16] and may "consider any fact relating to the best interest of the child,"[17] including the statutory factors, in terminating parental rights. Here all five factors support a determination that Doug did not remedy the conduct or conditions placing Damien at substantial risk of harm.

### 1. Damien has a low likelihood of returning to Doug within a reasonable time.

The superior court found that Doug "failed to acknowledge or accept that he is the cause of [Damien's] fear." Dr. Rose's evaluation placed a high priority on Doug acknowledging that his actions were wrong. According to Dr. Rose, Doug needed to appreciate "the nature and extent of [Damien's] psychological problems" and the role he played in contributing to them. Doug's own expert, Vivian Patton, explained, "[Doug is] not conscious or aware that a change needs to occur." In his own testimony, Doug described the incidents as "fall[ing] short as most people do," trivializing the severity of his conduct and the serious impact his conduct had on Damien. The court concluded that Doug "has not taken responsibility in the sense of thinking that what he has done is wrong. Change has not occurred." The superior court commented that Doug "comes off kind of blaming everybody else," that Doug blamed his girlfriend and her children for distracting his focus on Damien, and that he blamed having "too much on [his] plate and not knowing how to properly address everything." Ultimately, the superior court saw the situation "as a failure [of Doug] to fulfill [his] obligations." Doug's unwillingness to take responsibility for his actions in the two years since he first came into contact with OCS illustrates that there is a low likelihood of reunification in the reasonable future.

### 2. Doug only put in a minimum amount of effort to remedy his conduct.

The superior court found that Doug "engaged only minimally in his case plan." On appeal Doug emphasizes that he had learned a skill that would allow him to obtain gainful employment to support himself and his son, had completed some of the classes required by his case plan, and had participated in whatever counseling and anger management he could afford.

The record shows that in the two years between the second incident and trial, Doug failed to seriously undertake the kind of counseling and therapy necessary to make him a safe parent for Damien. Dr. Rose and OCS repeatedly emphasized that the most important part of Doug's case plan was individual therapy, yet Doug only attended four sessions between 2007 and 2009. Doug did not follow through on his required anger management classes, and essentially ignored or rejected the recommendation that he abstain from marijuana and alcohol use.

Doug contended that he could not afford more therapy sessions, but his claims that he would restart and complete counseling and substance abuse treatment once he had a higher income are contradicted by the record. He admitted at trial that "the financial reasons weren't the biggest" reasons he did not continue therapy, and he testified that he did not complete the substance abuse program because he was being "put through something that [he] didn't feel [he] needed to go through." Based on this evidence, the superior court did not err in concluding that the real problem in this case was Doug's "feelings and his attitude and his responsibility to [the problems identified by OCS]," rather than his financial limitations. Doug's actions and attitude indicate a minimal amount of effort to remedy the conduct that made Damien a child in need of aid.

We have repeatedly recognized that a child's need for permanence and stability should not be put on hold indefinitely while the child's parents seek to rectify the circumstances that cause their children to be in need of aid.[18] Because Doug failed to take

---

**16.** AS 47.10.088(c).

**17.** AS 47.10.088(b).

**18.** *See, e.g., Kent V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 233 P.3d 597, 603 (Alaska 2010); *Carl N. v. State, Dep't of Health and Soc. Servs., Div. of Family & Youth Servs.,* 102 P.3d 932, 936–37 (Alaska 2004); *J.H.*

therapy seriously, the superior court was forced to consider that Doug would have to start the therapeutic portion of his case plan from the beginning. Dr. Rose believed that Doug would "require a considerable treatment period to properly address [his issues]" and that even under the best of circumstances making the necessary changes would "take[ ] a year or more of sustained therapy." Giving Doug another chance to remedy the conduct that made Damien a child in need of aid would inevitably extend Damien's period of uncertainty and instability. The superior court was required to consider this factor when it ruled on the second element of the termination petition.

### 3. Damien suffered significant harm as a result of Doug's conduct.

Doug was involved with OCS for over two years. He first came into contact with OCS in September of 2005 after he beat Damien with a spoon and left significant bruises. His second contact came in September of 2007 when he beat Damien with a belt and left extensive welts and bruises on Damien's back, torso, legs, and bottom. Damien suffered tremendous trauma from the incidents and continued to suffer from them at the time of the trial: he had nightmares of his father beating and killing him; mental health professionals diagnosed Damien with PTSD resulting from Doug's abuse; and Damien repeatedly described significant fear of his father and the possibility that he might be returned to his father's care. We agree with the superior court's assessment of the evidence: Damien suffered significant harm as a result of Doug's conduct.

### 4. There is a high likelihood that Doug will continue to engage in harmful conduct.

Doug's failure to take full responsibility for his conduct is a strong indication that abuse

may occur again.[19] In fact, Doug was involved in several incidents during visitation that raised significant concerns, ultimately leading to discontinuation of the visits. OCS supervisors found some of Doug's conduct rigid and controlling. During a basketball game, Doug verbally disciplined Damien after he was instructed not to do so. That incident left Damien in tears and in fear that Doug may hurt him. During another visit, Doug threatened to "hunt down" Damien if he continued to tell people what Doug had done. Visitation was stopped because Damien was decompensating and was at risk for hospitalization. Rather than taking responsibility for his conduct, Doug complained that he did not get credit for the days when he was not abusing Damien. Given this record, the superior court correctly concluded that "change has not occurred."

### 5. Doug's history of conduct warrants termination.

Doug beat Damien on at least two occasions over a two-year span, thus requiring OCS intervention. He threatened and intimidated Damien, leaving him suffering with significant anxiety and PTSD. Doug also failed to engage in the case plan designed by OCS to rectify his conduct and demonstrate that he is capable of reunification. Doug's conduct and the harm done to Damien resulted in the superior court's well-supported conclusion that "it is contrary to the welfare of the child to return [him to Doug]."

### C. OCS Made Reasonable Efforts To Provide Doug With Family Services.

▆▆ A court considers reunification efforts in their entirety when reviewing whether OCS made reasonable efforts.[20] The superior court found that OCS made reasonable efforts to provide family support services to Doug, including "repeated efforts

---

v. State, Dep't of Health & Soc. Servs., 30 P.3d 79, 87 (Alaska 2001).

**19.** Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 74 P.3d 896, 903 (Alaska 2003) ("The superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior." One predictor of future behavior is the parent's

failure to "fully accept or understand [his] children's disabilities.").

**20.** Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 234 P.3d 1245, 1262 (Alaska 2010) (citing Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 77 P.3d 715, 720 (Alaska 2003)).

to engage [Doug] in a case plan and in substance abuse treatment." Doug raises seven contentions in support of his argument that OCS failed to make reasonable efforts, claiming that OCS failed to assist him in: (1) obtaining counseling; (2) obtaining a parenting assessment; (3) obtaining an updated evaluation by Dr. Rose; (4) keeping Doug informed about Damien's schooling and medication; (5) participating in Damien's treatment team meetings; (6) ensuring Doug and Damien's therapists had necessary information; and (7) visiting Damien. Having considered these arguments, we agree with the superior court that reasonable efforts were made.

### 1. Assisting Doug in obtaining counseling

Doug argues that OCS's failure to help him pay for counseling or assist him in obtaining affordable counseling constitutes a failure to make reasonable efforts. OCS counters that it was not OCS's duty to request or provide funding to pay for Doug's ongoing therapy, particularly under the circumstances of this case.

Doug primarily relies on Section 6.2.2.7 of the OCS's Child Protective Services Manual to support his argument that OCS should have helped pay for his ongoing individual therapy. This provision covers special needs funds, and lists "counseling, therapy" among the services that can be provided to parents. The manual states "OCS *may* pay for counseling or therapy services only when it is necessary to … return a child to the child's own home." It also explains that "OCS is the payer of *last* resort. Consideration must be given to the parent's resources/income, insurance, and/or Medicaid. Providers who have sliding scale fees should be used if appropriate and available. Requests are reviewed on a case-by-case basis."

As OCS points out, Doug never presented this policy at trial. And while Doug often stated at trial that his ability to participate in counseling was limited by his ability to pay, he also conceded that "financial reasons weren't the biggest thing" keeping him from participating in individual therapy. Doug also chose his individual therapist, although more affordable options were available. Doug's social worker spoke with his therapist about the possibility of payment on a sliding scale; when that option proved unavailing he asked Doug if he would be willing to see a different, more affordable therapist. Doug refused. Doug's expert also indicated that, "there are programs out there that do deferred fees or sliding scale fees and those programs should be sought out." Doug chose not to seek counseling services from other programs or more affordable providers.

The evidence strongly suggested that Doug's inability to pay was a secondary reason why he did not attend therapy. Doug's trial counsel seemed to concede this point, stating that therapy "didn't seem profitable to [Doug]" because he perceived his therapist had not received all the information she needed to help him. Further, Doug chose not to keep the job he held at the beginning of the case plan.

### 2. Obtaining a parenting assessment

Doug argues that OCS failed to make reasonable efforts because it did not obtain a parenting assessment evaluating Doug's interactions with Damien. Doug emphasizes that on several occasions persons involved with the case recommended a parenting assessment evaluating Doug and Damien. But Dr. Rose did conduct a parenting assessment, just not one with Doug and Damien together. Dr. Rose explained at trial that for a parenting evaluation "there's not necessarily a need for observing parents and children together," and that in an abuse case the "concern would be primarily with the parent's behavior." Dr. Rose testified that a parenting assessment addressing only parenting capacity, and not parent-child bonding, was sufficient in this case. According to Dr. Rose, a bonding assessment might have been helpful after Doug made progress on his individual therapy, but the centerpiece of Doug's case plan and Dr. Rose's evaluation was individual mental health therapy to address Doug's psychological and anger management issues. Doug's case plan specifically emphasized that his progress in the area of parenting would only come after he made

substantial progress with his mental health therapy. Because Doug failed to make progress with his own mental health therapy, he never got to the point where a parent-child bonding assessment was indicated. The failure to obtain a bonding assessment was not a failure to make reasonable efforts.

### 3. Obtaining an updated evaluation by Dr. Rose

Doug also argues that OCS failed to make reasonable efforts because it did not get an updated evaluation of Doug by Dr. Rose. We are not persuaded there was need for Dr. Rose to conduct an updated psychological evaluation because Doug made so little progress in his mental health therapy.

In his argument on appeal, Doug emphasizes that psychological evaluations are usually updated once a year, and that Dr. Rose specifically requested, but was denied, the opportunity to evaluate Doug a second time. While this may be the case, Dr. Rose testified at trial that if Doug "has not engaged in the services that I recommended since the time I made the recommendations then there's no evidence ... that there have been any significant changes." We agree. Doug's failure to address his significant psychological and anger management issues negated any need for an updated evaluation. OCS was not required to pay for a new evaluation when there was no objective reason to conclude that Doug had made progress in his case plan.

### 4. Keeping Doug informed about Damien's schooling and medication

Doug argues that OCS failed to notify him of important decisions relating to Damien's education and medical treatment. But Damien's doctor, not OCS, was obligated to notify Doug of important medical decisions. Doug also argues OCS never informed him of Damien's placement at North Star Behavioral Health, but the record shows that OCS sent Doug notice by mail. As for Doug's argument that OCS failed to keep him in-

formed of Damien's school transfer, the transfer from one school to another was based on the school's Individualized Education Program for Damien, not OCS's actions. None of these alleged shortcomings rises to the level of a failure to make reasonable efforts.

### 5. Allowing Doug to participate in Damien's treatment team meetings

Doug argues that OCS should have allowed him to participate in Damien's treatment team meetings. This argument overlooks that OCS initially sought to have Doug participate in Damien's therapy, and Doug chose not to participate. Howard testified that Doug initially expressed a desire not to participate in Damien's therapy. Further, when Doug did appear at a team meeting in January 2009, he appeared late, was hostile, and was antagonistic. Doug raised his voice when he arrived in the lobby and upset Damien who was escorted out of the lobby by a therapist. Doug was told that he would not be able to participate in that meeting, and that future participation would depend on Damien's best interests. After a discussion with Damien's guardian ad litem, Howard decided it was not in Damien's best interests to include Doug in Damien's therapy meetings because Damien's expectation was that his communications with Howard would be kept confidential. While parental participation in treatment team meetings should be encouraged, it must be fostered consistent with the child's best interests.[21] Here, OCS reasonably concluded that Doug's participation was not in Damien's best interest and the superior court did not err by concluding that the decision to exclude Doug from future meetings did not defeat OCS's showing of reasonable efforts.

### 6. Ensuring Doug and Damien's therapists had necessary information

Doug also argues that "OCS also failed to ensure that Doug's therapist, and Damien's

---

21. AS 47.10.005 (setting forth the goal that state involvement in a CINA case "promote the child's welfare and the parents' participation in the up-

bringing of the child to the fullest extent consistent with the child's best interests ...").

therapist all had relevant information." Doug's main criticism is that his therapist should have been provided with more information about Damien's needs. The therapist agreed that such information would have made her counseling more effective, but she stressed they could have moved forward immediately in other areas. The central focus of Doug's therapy was the psychological and anger management issues identified by Dr. Rose. Dr. Rose emphasized that only after substantial progress was made in this area would he move on to focus on Doug's parenting issues. Doug's therapist testified that once she had Dr. Rose's report in March 2008, she had clear direction and enough information to proceed with Doug's therapy.

From our review of the record it appears that Doug's therapist and OCS could have done a better job communicating with each other about this case. But given the small number of therapeutic visits Doug attended, it is clear that any communication shortcomings did not constitute a failure to make reasonable efforts nor meaningfully contribute to Doug's failure to make progress in his case plan.

### 7. Allowing Doug to visit Damien

Doug argues that OCS's refusal to allow visitation with Damien from September 2007 to January of 2008, and then again from March 2009 forward, demonstrates that OCS did not make reasonable efforts to provide family support services to Doug.

Damien was placed in state custody in September 2007 following his second incidence of child abuse in less than two years. Damien's original therapist advised against visitation because Damien "expressed fear of his father" and because of Doug's "disregard for appropriate parenting help and [failure to take] responsibility for removals." Damien's grandmother and social worker both report-

ed that Damien was happy he had reported his father, whom he hoped would go to jail so he could no longer beat him. Damien's primary therapist, Kristin Howard, reported that Damien had "numerous" nightmares involving Doug drowning, killing, hurting, and beating him, often occurring several times a week.[22] Following the 2007 removal, Damien was diagnosed with PTSD, and his care providers observed that his anxiety and fear were triggered by certain facial expressions of his father or seeing his father's belt. All of these conditions justified the decision to stop Doug's visitation.

After Doug resumed visitation with Damien in early 2008, Damien's therapist reported that Damien was experiencing increased agitation and anxiety following the visits. Damien told his therapist "that every time he closed his eyes he would see his father beating him." His therapist also explained that Damien "doesn't fully trust his father to be safe with him." His teacher reported increased anxiety and behavioral problems both before and after visits with his father. Visitation was terminated in March 2009 after Damien reported to his social worker that Doug threatened him during a supervised visit and his therapist concluded Damien was decompensating quickly and was at risk for psychiatric hospitalization.

### D. The Superior Court Did Not Err In Terminating Parental Rights And Not Establishing A Guardianship.

■ Alaska Statute 47.10.110[23] permits but does not require the appointment of a guardian when "it appears to the court that the welfare of a minor will be promoted by the appointment of a guardian."[24] The superior court is not required to consider guardianship in a parental termination proceeding, "except to the extent that the statute re-

---

22. For example, Howard related an interaction with Damien in May 2009 where he "drew a picture of [himself] and his father, [and] described a dream in which he was assaulted by . . . a man wearing a mask and the man took off his mask and it was his father who then shot him."

23. AS 47.10.110 provides: "When, in the course of a proceeding under this chapter, it appears to the court that the welfare of a minor child will be promoted by the appointment of a guardian or custodian of the minor's person, the court may make the appointment."

24. *C.W. v. State, Dep't of Health & Soc. Servs.*, 23 P.3d 52, 57 (Alaska 2001).

quires the court to order an arrangement that is in the child's best interest."[25]

The superior court implicitly rejected the guardianship proposal. It noted that Damien needs "stability, [and] the certainty that he will be protected from his angry, abusive father." The court expressed hope that Doug would change and that a healthy relationship could be established, but observed "that's not what the evidence has shown has occurred up to now." The potential that Doug may one day be able to change is not sufficient to suggest, much less prove, that guardianship is in Damien's best interest.

### E. The Superior Court Did Not Err In Denying Doug's Request For More Time.

■ Doug argues that he should have been given more time to meet the case plan and remedy the conditions that harmed Damien. He specifically contends that he may be able to obtain a better paying job soon, which would make it easier to pay for counseling.

When a court finds that a parent has not remedied poor behavior in a reasonable time under AS 47.10.088(b)(2), it may also readily find that termination of parental rights is in the child's best interest under AS 47.10.088(c).[26] We have observed that courts may consider factors such as a parent's determination and capability to change when assessing whether termination is in the best interest of the child.[27] In this case, Doug has not demonstrated determination to change. Doug admits that "financial reasons weren't the biggest thing" keeping him from participating in individual therapy. He did not seek more affordable solutions that even his expert acknowledges existed. Doug put in little effort to meet the case plan but complained often that OCS was not doing enough to pay for his counseling, to pay for his transportation, or to excuse him from the requirement of completing his case plan. As the superior court observed, "there has to be change in his feelings and his attitude and his responsibility to these problems instead of saying that somebody else didn't give me bus fare."

## V. CONCLUSION

We AFFIRM the judgment of the superior court in all respects.

CARPENETI, Chief Justice, and STOWERS, Justice, not participating.

---

**25.** *Id.*

**26.** *Karrie B. ex rel. Reep v. Catherine J.,* 181 P.3d 177, 186 (Alaska 2008).

**27.** *Id.*