CARPENETI, Justice,
dissenting.
I disagree with today's opinion because the State provided the trial court with virtually no specific, particularized information concerning (1) the children who were before the court and (2) whether termination of their mother's parental rights was in their best interests. This failure left the court in an information vacuum which made it impossible for the court to make an informed decision about whether termination was in these children's best interests. I would therefore remand for the taking of evidence specific to *970 Zach and Abbie's particularized situations, including the extent to which they have bonded with their mother, their current needs and developmental states, and (at least as to Zach) their preferences in the matter.
Zach and Abbie, the children before the court, lost their father to cancer in 2008. At the time of trial they were not infants but were children who had passed the age that, according to the legislature, is most critical to parental bonding.[1] Both children, and especially Zach, had already formed strong bonds with their mother. The guardian ad litem's Permanency Report of April 14, 2010-about 17 months before the termination trial-said this about Zach's bonding with his mother:
[Zach] is very attached to his mother and continues to do well with her close by-regular contact, interaction on a daily basis, her participation in his school and extracurricular activities, ete. With the loss of his father, he has continually expressed his concern to the GAL that "my fomily" (himself his mother and sister) all stay together.
(Emphasis added.) The guardian ad litem's Disposition Report of January 2010 noted that the children had been placed with family friends who were very close neighbors and that this allowed the children to remain in close proximity to their mother. It noted that the children "need stability, consistency and permanency with their mother as quickly as possible-they share an extremely strong bond and this needs to be nurtured as a fomily umit" (Emphasis added.) The March 2011 Permanency Report from the guardian ad litem-six months before the termination trial-reported that "[bloth children remain bonded with their mother."
Despite the overwhelming evidence that Zach and Abbie shared strong bonds with their mother, the State presented no evidence to the superior court as to the effect of terminating their mother's parental rights on the children. Moreover, a review of the testimony presented to the court shows that the State's case was almost entirely based on generalizations:
e The State's expert had never met the children, had never met the mother, and had never observed her with her children. The expert's testimony was in effect based on a review of the record. While we have endorsed the idea that expert testimony may be based on a record review,[2] the record review here was remarkably skimpy. The expert conceded that she "didn't read a lot about the kids," while stating that they were in a secure placement. Upon eross-examination, she admitted that she had not read anything else about the children other than that they were in a secure placement. The expert commented on the amount of time the children were out of the home in placement, but admitted that she did not know that for some of that time they lived with their mother or were cared for by her. (Indeed, the State admitted at trial that the children were in their mother's care for enough of the time that the children were in foster care that the State sought to recover part of its foster care payments from the foster parents for that time.) The expert was unaware of the amount of time the children had visited with their mother, and she did not know how frequently visitation took place, or how the visits went.
e The one social worker called by the State was not the assigned social worker, but was instead her supervisor. Almost all of her testimony consisted of generalizations about what kinds of harmful effects on children might be expected by the particular acts of pa *971 rental neglect that were found in this case. While her testimony was strong in a general sense, it could not establish that these children suffered the harmful effects that might generally be expected.
In comparison with the generalizations upon which the State relied, the record contains substantial evidence that these children, especially Zach, were extremely bonded with their mother. The evidence showed that (1) Zach was very attached to his mother 17 months before the trial and that this attachment continued through the time of trial; (2) Zach had continually expressed his desire that his family (himself, his mother, and his sister) all stay together; (8) Abbie shared an extremely strong bond with her mother; and (4) this bond continued up until the trial. Yet no evidence was produced at the trial as to the effect of a termination of parental rights on Zach and Abbie.[3] In light of this evidence of the strong connections between the children and their mother, the superior court should have weighed the loss of that bond in the best interests analysis. But it was unable to do so, because the State had not presented any evidence of the effect that termination of parental rights would have on the children.
Other than generalities, the court did not hear any testimony about these particular children, their needs and desires, their developmental states, or their progress in therapy. The court heard testimony from the social worker that termination can, depending on the child, result in trauma to a child, but the court heard no testimony about how these particular children might be impacted by termination of their mother's parental rights. The testimony and the trial court's findings in this case appear to have been based on the best interests of children in general, rather than on the best interests of Zach and Abbie in particular. The State's failure to present the court with evidence about the effect of termination on these particular children points up what I believe to be the legal error here: the reduction of the best interests finding to mere surplusage.
The legislature has set out five findings that a superior court must make before parental rights can be terminated: (1) that the child is in need of aid; (2) that the parental conduct remains unremedied; (8) that the State has made reasonable (or, in the case of Indian children, active) efforts to reunite the family; (4) that serious harm to the child will likely occur without termination; and (5) that termination is in the best interests of the child.[4] The testimony and the trial court's best interests findings in this case were based on the best interests of children in general, but not these particular children. But if courts were justified in determining only the best interests of "generic children" in making a best interests finding, it would appear that whenever all the other termination findings are satisfied-a child in need of aid finding, parental conduct remaining unremedied, reasonable efforts, and a substantial risk of harm to the child without termination-the best interests of the generic child will always be served by termination. But because we presume that the legislature intended that every part of a statute have some purpose, force, and effect,[5] the court must look at the best interests of the particular children before it.[6] That did not happen here.
Given the specific evidence in the record that these children were closely bonded to their mother just before the termination trial *972 began[7] and the lack of evidence on this subject at trial, along with the lack of evidence regarding the children's particular situations, including the preference of at least Zach in the matter,[8] I believe that we should vacate the superior court's best interest finding and remand so that the court can be provided with specific evidence pertaining to these children's best interests. Such evidence should include testimony by an expert who is at least well-versed in the facts pertaining to these children, and preferably one who has actually met Zach and Abbie and who can give expert testimony on the effect of termination on them: What is the state of their bonds with their mother? How will termination of the parent-child relationship affect their development? Are there permanency options available that might better serve the interests of these children than termination? It could include evidence by a social worker who has actually worked with these children, who knows their outlook and preferences, and can provide this information to the court. Armed with such information, the court could make an evidence-based decision on these children's best interests.
In evaluating what is in Zach and Abbie's best interests, the court would have options other than termination or reunification of the children with their mother. Although the testimony of the social worker suggested that these were the only options, the choice in a case such as this is not so simple. Federal and state law contemplate permanency outcomes in addition to termination or reunification, including guardianship and placement with a fit and willing relative.[9] We have stated that a trial court need not consider such arrangements in the course of termination proceedings "except to the extent that [AS 47.10.088] requires the court to order an arrangement that is in the child's best interest." [10] This is such a case. While we have, on numerous occasions, reiterated this holding in rejecting appellants' claims that a trial court erred in failing to consider or order guardianship in lieu of termination, in each such instance the trial court had, at some point, considered whether guardianship was an appropriate permanency outcome for the child, or had at least examined the particulars of the child's situation and found that continued contact between the child and the parent was not justified given the particular facts of the case.[11] In this case, the trial court conducted no such analysis or examination. Today's opinion also relies on J.H. w. State, Department of Health and Social Services *973 [12] and Hannah B. v. State, Department of Health and Social Services, Office of Children's Services[13] as cases that resemble Thea G.'s case. But the children in J.H. and Hannah B. were only three years old and four years old respectively, and those cases clearly did not involve the types of mature bonding issues and expressed preferences as does the present case.
I agree with the superior court and today's opinion that Zach and Abbie's mother has failed them terribly in many ways and that she is not now fit to act as their parent. But that is not the question before us. The question is whether it is in the best interests of these children-both of whom are strongly bonded with their mother and one of whom has expressed the fervent desire that what remains of their family following their father's death be "kept together"-to sever the parental bond without considering the effect of doing so on the children, or even hearing from them, and without considering alternatives to termination. Before that decision can be made, the superior court should be provided direct evidence on this issue so that it can make an informed decision on what is in the best interests of these children. Because the court was not provided with that information, I respectfully dissent.

. In AS 47.05.065(5)(A) the legislature found that "children undergo a critical attachment process before the time they reach six years of age." Zach was 12 at the time of the trial, while Abbie was six.

. See C.J. v. State, Dep't of Health & Soc. Servs., 18 P.3d 1214, 1218 (Alaska 2001) (declining to hold that a meeting between the expert and the parties to the termination proceeding is necessary in every case, but reversing termination because the expert's opinion was not sufficiently based on the particular facts of the case); J.J. v. State, Dep't of Health & Soc. Servs., 38 P.3d 7, 9-10 (Alaska 2001) (same).

. Indeed, when counsel for the mother attempted to bring before the court evidence of the children's preference at the time of trial, the State successfully resisted.

. See AS 47.10.011; 47.10.088. AS 47.10.086; AS

. See Mechanical Contractors of Alaska, Inc. v. State, Dep't of Pub. Safety, 91 P.3d 240, 248 (Alaska 2004) (holding that when court engages in statutory construction it will presume every provision of statute "to have some purpose, force, and effect, and that no superfluous."). ... provisions are

. Perhaps in the case of an infant removed from a parent at or close to birth, who has had no opportunity to bond with the parent, a "generic child" analysis might suffice. But in the case of a 12-year-old like Zach, who was "very attached" to his mother and who "continually expressed his concern ... that [bis] family all stay together," a generic analysis is insufficient.

. The strongest evidence in this regard pertains to Zach. But the evidence concerning Abbie is also substantial: When she was almost five, she was described as having "an extremely strong bond" with her mother, which remained unchanged when she was a month short of six. And in light of the legislative findings contained in AS 47.05.065(5)(a)-'"'children undergo a critical attachment process before the time they reach six years of age ..."-the superior court should have been provided updated information regarding Abbie's bonding with her mother at the time of the termination trial.

. Cf. AS 25.23.040(a)(5) (requiring court to obtain consent of minor child to adoption if child is ten years of age or older unless court dispenses with minor's consent in best interests of minor).

. With regard to federal law, see 42 U.S.C. § 675(5)(C) (listing reunification, adoption, legal guardianship, placement with a fit and willing relative, and "another planned permanent living arrangement" as possible permanency outcomes). With regard to state law, see AS 47.10.083 (gradual reunification); AS 47.10.084 (legal custody and guardianship); AS 47.10.080(c)(2) (placement with a fit and willing

. C.W. v. State, Dep't of Health & Soc. Servs., 23 P.3d 52, 57 (Alaska 2001).

. See Doug Y. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 243 P.3d 217, 219 (Alaska 2010) (child wanted father to go to jail "so his dad would quit beating him"); A.J. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 62 P.3d 609, 615 (Alaska 2003) (parent had "history of interfering with the children's placements" justifying termination over guardianship); Lucretia G. v. State, Dep't of Health & Soc. Servs., 2006 WL 668725 at "6 (Alaska 2006) (unpublished opinion) (child regarded further contact with mother as "cause for alarm"); Matthew B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 2005 WL 628809 at *4 (Alaska 2005) (unpublished opinion) (superior court specifically considered guardianship but found that proposed guardian was unavailable for at least 12 months); Christopher D. v. State, Dep't of Health & Soc. Servs., 2004 WL 243556 at *3 (Alaska 2004) (unpublished opinion) (guardianship not in best interests of severely emotionally disabled children dealing with attachment disorders who needed stable home environment)}.

. 30 P.3d 79 (Alaska 2001).

. 289 P.3d 924 (Alaska 2012).