NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DONALD L., | ) | |
| | ) | Supreme Court No. S-17344 |
| Appellant, | ) | |
| | ) | Superior Court Nos.: |
| v. | ) | 3PA-16-00119/120 CN |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, | ) | AND JUDGMENT* |
| OFFICE OF CHILDREN'S SERVICES, | ) | |
| | ) | No. 1747 – October 30, 2019 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Gregory Heath, Judge.

Appearances: J. Adam Bartlett, Anchorage, for Appellant. Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, and Maassen, Justices. [Carney, Justice, not participating]

## I. INTRODUCTION

An incarcerated father appeals the termination of his parental rights to his two young Indian children, arguing that the superior court should have ordered a guardianship pending his release from prison and his demonstration of adequate parenting skills. We conclude, however, that the evidence supports the court's decision

---

\* Entered under Alaska Appellate Rule 214.

that termination was in the children's best interests, given the father's history of crime and incarceration, his time left to serve, the additional time it would likely take after his release to demonstrate his fitness to parent, and the lack of a strong bond between him and the children. We therefore affirm the order terminating the father's parental rights.

## II.    FACTS AND PROCEEDINGS

Donald L. is the father of Donna and Derek, ages five and three,[1] who are Indian children as defined in the Indian Child Welfare Act (ICWA).[2] Donald has been in and out of prison his entire adult life; since 1984 he has had at least 11 felony and 28 misdemeanor convictions. Most of his crimes reflect his long-term alcohol abuse. Many are crimes of harassment or assault against family members or women with whom he was intimately involved.

Donald met the children's mother, Pamela, in late 2013 while he was living at a halfway house. Pamela became pregnant and gave birth to Donna in July 2014; Donald was back in prison at the time, having broken the halfway house rules about unauthorized travel and attending Alcoholics Anonymous meetings. He was released on parole in December 2014. Early the next year the Office of Children's Service (OCS) received several reports of domestic violence in Donald and Pamela's home, but both parents denied any problems.

Pamela gave birth to Derek in November 2015. A few months later Donald was back in prison for a parole violation. In April he was paroled again on condition that he engage in substance abuse treatment, but he failed to do so. He was arrested again in

---

[1]    Pseudonyms are used to protect the family's privacy.

[2]    *See* 25 U.S.C. § 1903(4) (2018) (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.")

May 2016 for assaulting Pamela, who reported an ongoing pattern of domestic abuse. Donald pled guilty to third-degree assault, and the resulting sentence, along with the revocation of his parole, meant that he remained in prison through trial in this case with an expected release date in January 2022.[3]

In May 2016 Pamela told OCS that the children were staying with Donald's friends, the Cooks, "to keep OCS from 'getting them.'" OCS removed the children from the Cooks' custody later that month following a report of neglect. The children were placed with a foster family, where they remain; OCS denied placement with the Cooks because of the children's condition when OCS took custody of them — Donna was covered in scratches and bug bites and was unnaturally quiet for a two-year-old — and because of the Cooks' apparent role in trying to hide the children from OCS.

OCS created a case plan for Donald, who took steps toward completing it. He had a substance abuse assessment in June 2016 and was diagnosed with a "severe" alcohol use disorder. He had substance abuse treatment in prison but was recommended for outpatient treatment upon his eventual release "to continue building his foundation as a sober productive community member." He completed a parenting class and may have completed a domestic violence class.[4]

OCS also arranged services for the children. Donna was diagnosed with unspecified anxiety disorder and required mental health services and speech therapy.

---

[3]     At the termination trial Donald testified that his current release date is in December 2021 instead of January 2022. The minor difference does not affect our decision.

[4]     Donald said at trial that he had completed the domestic violence class and mailed the certification to OCS, but the OCS caseworker testified that she had not seen proof of completion in the file.

Both children resisted visiting Donald in prison; the visits caused them stress and anxiety and were eventually discontinued.

OCS petitioned for termination in March 2018, and a termination trial was held in September. Pamela relinquished her parental rights during trial, leaving only Donald's rights at issue.

OCS presented as its proposed expert witness a social worker with extensive education and experience in child welfare; in the absence of objection the court accepted her as an expert for purposes of ICWA's expert testimony requirement.[5] The expert testified that termination of Donald's parental rights was in the children's best interests and that the children would likely be harmed if returned to his care. She noted Donald's cycle of incarcerations and the likelihood he would re-offend and again be unavailable to parent his children. She emphasized the parents' absence from their children's lives "in a caretaking role" and the effect this had on the children's need for attachment, which "writes the map for their future relationships." The expert expressed concern that exposure to domestic violence as documented in the home could cause "long-term damage" and interfere with the children's attachment to any eventual caregiver.

The expert testified that based on Donald's history and behavior, it would be a "significant period of time" following his release from prison before trial home visits could begin and before OCS could determine whether "he really had made behavior[al] change." The expert testified she was "not sure [this change] would occur"

---

[5]     25 U.S.C. § 1912(f) (providing that order terminating parental rights requires "a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the chid by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child").

but it would take "minimally a year" following Donald's release to find out; there would have to be "a long clinical re-introduction to the children" in consultation with "an attachment and bonding specialist." Even then, given the children's special needs, Donald "would need consistent and above-average parenting skills." The expert testified that it would not be in the children's best interests to wait that long. She testified that the children "need to . . . put this behind them, as they already have shown us that they are doing by attaching securely to the foster parent and making the progress that they have."

Donald's attorney asked the ICWA expert whether in some cases involving an incarcerated parent it might be advisable to place the children with "a reasonably suitable alternative placement, . . . like a guardianship, to maintain custody of the child [until] the parent gets released from custody." The witness's answer was unequivocal: "Not in children this young. It's really against our policy to do so." She testified that "guardianship really isn't appropriate for most kids" but is used mainly for teenagers who already have a developed relationship with their parents "and they personally don't want that terminated." She noted again the absence of a strong parental bond, Donald's history of incarceration, and the unlikelihood that he would be able to turn his life around even once he was released. The OCS caseworker assigned to the family's case later testified that she agreed with the ICWA expert's conclusions.

The court made the findings necessary to support the termination of Donald's parental rights. It found that the children were in need of aid due to Donald's incarceration as well as neglect and substance abuse. It found that Donald "has been unable to distance himself from alcohol, which has wreaked havoc on [his] life and the lives of those around him." The court noted that although Donald had "completed multiple drug and alcohol treatment programs" and "been involved with a drug and alcohol treatment program for most of his adult life[,] . . . none of the tools learned during these treatment programs has had any effect on his behavior." Furthermore, the

court found that Donald had "not changed his attitude or accepted any responsibility for the children being in custody, or identified how his future behavior would keep the children safe."

The court described Donald's extensive criminal history and identified his current release date. The court observed that "[i]t would be unreasonable to prevent these children from achieving permanency by requiring them to wait for [Donald] to serve his sentence and then establish himself as a safe and stable parent outside of jail. Children this young deserve to achieve permanency expeditiously." The court noted that the children were "very bonded to the foster family who have provided for all their emotional and physical needs." It concluded that the children's best interests would "be promoted by terminating [Donald's] parental rights."

Donald appeals, arguing only that the court erred by finding that termination was in the children's best interests, and particularly that the court should have given greater consideration to establishing a guardianship pending Donald's rehabilitation as a parent.

## III. STANDARD OF REVIEW

"A trial court's determination that termination of parental rights is in a child's best interests is a factual finding that we review for clear error."[6] "Findings are clearly erroneous 'if a review of the entire record in the light most favorable to the party prevailing below leaves us with a definite and firm conviction that a mistake has been made.' "[7] "Generally, conflicting evidence is insufficient to overturn the superior court's decision, and we will not reweigh evidence when the record provides clear support for

---

[6] *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 962 (Alaska 2013).

[7] *Id.* at 961-62 (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

the superior court's ruling."[8] "We give deference to the superior court's credibility assessments, especially when such assessments are based on oral testimony."[9]

## IV. THE SUPERIOR COURT DID NOT CLEARLY ERR BY DETERMINING THAT TERMINATION WAS IN THE CHILDREN'S BEST INTERESTS.

Donald argues that the children's best interests required that they be placed in a guardianship while he completed his prison term and worked on his ability to be a successful parent. He argues that his criminal record notwithstanding, he is now "at a turning point in his life and . . . ready to do whatever is necessary to reunite with his children." He notes that he "made efforts to have his children cared for by lifelong friends" (the Cooks) and that it was really Pamela's issues, not his, that caused his children to be in need of aid (though he does not directly challenge the court's child in need of aid findings based on his incarceration). Donald emphasizes his commitment to working on his case plan as much as possible while in prison and his commitment to his children as evidenced by his failed attempts to secure early release through post-conviction relief. He recognizes that the children are younger than the ideal age for guardianship but argues that this should be overlooked in this case because "he is committed to the process" of "reintegrating into his children's lives"; he also contends that the lack of a strong parental bond is OCS's fault because of the lack of meaningful visitation in prison.

Before ordering termination, the superior court must find by a

---

[8] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 949 (Alaska 2013) (quoting *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 930 (Alaska 2012)).

[9] *Id.*

preponderance of the evidence that termination is in the best interests of the child.[10] "The superior court is not required to consider guardianship in a parental termination proceeding, 'except to the extent that the statute requires the court to order an arrangement that is in the child's best interest.' "[11] "The superior court 'may reasonably reject a request for guardianship if such a plan would be inconsistent with a child's need for stability and protection.' "[12] And the court need not make explicit findings regarding guardianship.[13]

Alaska Statute 47.10.088(b) lists the factors a court should consider when deciding which course of action is in a child's best interests:

> (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
>
> (2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
>
> (3) the harm caused to the child;
>
> (4) the likelihood that the harmful conduct will continue; and

---

[10] CINA Rule 18(c)(3).

[11] *Doug Y. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 243 P.3d 217, 229-30 (Alaska 2010) (quoting *C.W. v. State, Dep't of Health & Soc. Servs.*, 23 P.3d 52, 57 (Alaska 2001)); *see also* AS 47.10.088(c) ("In a proceeding under this chapter involving termination of the parental right of a parent, the court shall consider the best interests of the child.").

[12] *See Dena M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 442 P.3d 755, 762 (Alaska 2019) (quoting *Grace L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 329 P.3d 980, 987 (Alaska 2014)).

[13] *Doug Y.*, 243 P.3d at 230 (affirming termination in case where "[t]he superior court implicitly rejected the guardianship proposal").

(5) the history of conduct by or conditions created by the
parent.[14]

These listed factors "are not exclusive and the superior court need not accord a particular weight to any given factor."[15] The court may "properly consider[] the children's need for permanency, a crucial need for young children," and the extent the children have bonded with a foster family.[16] Also relevant is whether the parent will be able to care for the child within a reasonable time,[17] which is statutorily defined as "a period of time that serves the best interests of the child, taking in account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments."[18] A reasonable time is often shorter in cases involving younger children because of their critical need to attach to their caregivers.[19]

The evidence in this case supported the court's conclusion that the children could not be returned to Donald within a reasonable time. At the time of trial he had more than three years left on his prison sentence, and expert testimony supported a finding that he would need another year or more after his release to demonstrate the

---

[14]     AS 47.10.088(b).

[15]     *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1263 (Alaska 2010).

[16]     *Id.* at 1263-64.

[17]     *Id.*; AS 47.10.088(b)(1).

[18]     AS 47.10.990(30).

[19]     *See* AS 47.05.065(5) (setting out legislative findings about young children's critical need for attachment with caregivers in order to avoid "significant emotional damage that frequently leads to chronic psychological problems and antisocial behavior when the child reaches adolescence and adulthood" and the consequent importance of expediting permanent placements for young children).

necessary sobriety, stability, and parenting skills. And the superior court could reasonably conclude that even in this extended time frame, given Donald's cycle of crime and substance abuse, he was unlikely to exhibit the meaningful behavioral change necessary to support reunification.[20] Donald's crimes were not all youthful indiscretions, as he now attempts to characterize them; he committed significant crimes in his thirties and pled guilty to assaulting Pamela when he was 52. "The superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior."[21] Given the evidence that Donald, even after all the treatment and classes he had in prison over the years, still failed to accept responsibility for his behavior, the court could reasonably conclude that he was unlikely to change his behavior to the extent necessary to parent his children — and definitely not within a reasonable time.

The evidence also supported the court's rejection of guardianship as an alternative to termination. Both the OCS caseworker and the ICWA expert testified that guardianship was inappropriate because of the children's young age and their lack of a bond with Donald. The ICWA expert testified, in fact, that attempting to reintroduce Donald to the children in a few years would be harmful to them. The superior court found that the "children deserve to have permanency as quickly as possible" and "are very bonded to the foster family who have provided for all their emotional and physical needs." In light of this evidence, we cannot say that the court clearly erred in finding that termination was in the children's best interests.

---

[20] *See Doug Y. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 243 P.3d 217, 230 (Alaska 2010) ("The potential that Doug may one day be able to change is not sufficient to suggest, much less prove, that guardianship is in Damien's best interest.").

[21] *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003).

## V. CONCLUSION

We AFFIRM the superior court's order terminating Donald's parental rights.